Tom CAMPBELL, Member, U.S.
House of Representatives,
et al., Appellants,

v.

William Jefferson CLINTON, President
of the United States, Appellee.

No. 99–5214.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 22, 1999.

Decided Feb. 18, 2000.

Jules Lobel, Center for Constitutional Rights, argued the cause for appellants. With him on the briefs were Michael Ratner, Franklin Siegel, William Goodman and Jennifer Green of the Center for Constitutional Rights; James Klimaski, H. Lee Halterman and Joel E. Starr.

William B. Schultz, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee. On the brief were David W. Ogden, Acting Assistant Attorney General, Mark B. Stern and Robert M. Loeb, Attorneys, and Wilma A. Lewis, U.S. Attorney.

Before: SILBERMAN, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Separate concurring opinion filed by Circuit Judge SILBERMAN.

Separate opinion concurring in the judgment filed by Circuit Judge RANDOLPH.

Separate concurring opinion filed by Circuit Judge TATEL.

SILBERMAN, Circuit Judge:

A number of congressmen, led by Tom Campbell of California, filed suit claiming that the President violated the War Powers Resolution and the War Powers Clause of the Constitution by directing U.S. forces' participation in the recent NATO campaign in Yugoslavia. The district court dismissed for lack of standing. We agree with the district court and therefore affirm.

## I.

On March 24, 1999, President Clinton announced the commencement of NATO air and cruise missile attacks on Yugoslav targets. Two days later he submitted to Congress a report, "consistent with the War Powers Resolution," detailing the circumstances necessitating the use of armed forces, the deployment's scope and expected duration, and asserting that he had "taken these actions pursuant to [his] authority . . . as Commander in Chief and Chief Executive." On April 28, Congress voted on four resolutions related to the Yugoslav conflict: It voted down a declaration of war 427 to 2 and an "authorization" of the air strikes 213 to 213, but it also voted against requiring the President to immediately end U.S. participation in the NATO operation and voted to fund that involvement. The conflict between NATO and Yugoslavia continued for 79 days, ending on June 10 with Yugoslavia's agreement to withdraw its forces from Kosovo and allow deployment of a NATO-led peacekeeping force.[1] Throughout this period Pentagon, State Department, and NATO spokesmen informed the public on a frequent basis of developments in the fighting.

Appellants, 31 congressmen opposed to U.S. involvement in the Kosovo intervention, filed suit prior to termination of that conflict seeking a declaratory judgment that the President's use of American forces against Yugoslavia was unlawful under both the War Powers Clause of the Constitution and the War Powers Resolution ("the WPR"). *See* 50 U.S.C. § 1541 *et seq.* The WPR requires the President to submit a report within 48 hours "in any case in which United States Armed Forces are introduced . . . into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances," and to "terminate any use of United States Armed Forces with respect to which a report was submitted (or required to be submitted), unless the Congress . . . has declared war or has enacted a specific authorization for such use of United States Armed Forces" within 60 days. Appellants claim that the President did submit a report sufficient to trigger the WPR on March 26, or in any event was required to submit a report by that date, but nonetheless failed to end U.S. involvement in the hostilities after 60 days. The district court granted the President's motion to dismiss, *see Campbell v. Clinton,* 52 F.Supp.2d 34 (D.D.C.1999), and this appeal followed.

## II.

The government does not respond to appellants' claim on the merits. Instead the government challenges the jurisdiction of the federal courts to adjudicate this claim on three separate grounds: the case is moot; appellants lack standing, as the district court concluded; and the case is nonjusticiable. Since we agree with the district court that the congressmen lack standing it is not necessary to decide whether there are other jurisdictional defects.

The question whether congressmen have standing in federal court to challenge the lawfulness of actions of the executive was answered, at least in large part, in the Supreme Court's recent decision in *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). *Raines* involved a constitutional challenge to the President's authority under the short-lived Line Item Veto Act. Individual congressmen claimed that under that Act a President could veto (unconstitutionally) only part of a law and thereby diminish the institutional power of Congress. Observing it had never held that congressmen have standing to assert an institutional injury as against the execu-

---

1. U.S. forces are currently stationed in Kosovo, which remains part of Yugoslavia, as part of the peacekeeping operation, but appellants do not claim that this deployment is relevant to their case.

tive, *see id.* at 821, 117 S.Ct. 2312,[2] the Court held that petitioners in the case lacked "legislative standing" to challenge the Act. The Court noted that petitioners already possessed an adequate political remedy, since they could vote to have the Line Item Veto Act repealed, or to provide individual spending bills with a statutory exemption. *See id.* at 829, 117 S.Ct. 2312.

Thereafter in *Chenoweth v. Clinton,* 181 F.3d 112, 115 (D.C.Cir.1999), emphasizing the separation-of-powers problems inherent in legislative standing, we held that congressmen had no standing to challenge the President's introduction of a program through executive order rather than statute. As in *Raines,* appellants contended that the President's action inflicted an institutional injury upon Congress, in this case by circumventing its legislative authority, but, we said,

> It is uncontested that the Congress could terminate the [contested program] were a sufficient number in each House so inclined. Because the parties' dispute is therefore fully susceptible to political resolution, we would [under circuit precedent] dismiss the complaint to avoid "meddl[ing] in the internal affairs of the legislative branch." Applying *Raines,* we would reach the same conclusion.

*Id.* at 116 (citation omitted).

There remains, however, a soft spot in the legal barrier against congressional legal challenges to executive action, and it is a soft spot that appellants sought to penetrate. In 1939 the Supreme Court in *Cole-*

*man v. Miller* voted 5–4 to recognize the standing of Kansas State legislators in the Supreme Court to challenge the actions of the Kansas Secretary of State and the Secretary of the State Senate. *See* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). That case arose out of a State Senate vote on the ratification of a constitutional amendment, the Child Labor Amendment, proposed by Congress in 1924. The State Senate split 20 to 20, and the Lieutenant Governor, the presiding officer of the Senate, then cast a deciding vote in favor. The State House subsequently also passed a ratification resolution. Thereupon the twenty State Senators who voted against ratification plus one more (who presumably had voted for the resolution) brought a mandamus action in the State Supreme Court challenging the Lieutenant Governor's right to vote.[3] They sought an order compelling the Secretary of the Senate to erase the endorsement on the resolution and restraining the Secretary of State from authenticating the resolution and passing it on to the Governor. The Supreme Court of Kansas entertained the action but ruled against the plaintiffs on the merits. Granting certiorari, the United States Supreme Court determined that "at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ... have an interest ... sufficient to give the Court jurisdiction," *id.* at 446, 59 S.Ct. 972, because they have a legal interest "in maintaining the effectiveness of their votes." *Id.* at 438, 59 S.Ct. 972.

---

2. The Court noted that it had found standing for a congressman in *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), where he was unconstitutionally excluded from Congress, thus depriving him of a salary and the House seat he was constitutionally due, both personal injuries. The Court did not decide whether congressmen would have standing to challenge actions of Congress which diminished their institutional role. *Cf. Michel v. Anderson,* 14 F.3d 623 (D.C.Cir.1994) (congressmen had standing to challenge House rule which diluted their vote in Committee of the Whole).

3. The government also challenges the congressmen's standing on the basis that they do not constitute a majority of the Congress. In *Raines* the Supreme Court did "attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action," but it declined to say how much importance. *Raines,* 521 U.S. at 829–30, 117 S.Ct. 2312. Because we find that appellants lack standing for another reason, we need not discuss that issue.

In *Raines* the plaintiff congressmen had relied on *Coleman* to argue that they had standing because the presidential veto had undermined the "effectiveness of their votes." The Supreme Court noted that *Coleman* might be distinguished on grounds that the federal constitutional separation of powers concerns that underlay its decision in *Raines* (and which we emphasized in *Chenoweth*) were not present, or that if the Court in *Coleman* had not taken the case a question of federal law— the ratification *vel non* by the Kansas Legislature—would remain as decided by the Kansas Court. *But cf. Coleman*, 307 U.S. at 465–66, 59 S.Ct. 972 (opinion of Frankfurter, J.). But the Court thought it unnecessary to cabin *Coleman* on those grounds. *See Raines*, 521 U.S. at 824 n. 8, 117 S.Ct. 2312. Instead, the Court emphasized that the congressmen were not asserting that their votes had been "completely nullified":

They have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. . . .

Nor can they allege that the Act will nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified . . .

In addition, a majority of Senators and Congressmen can vote to repeal the Act, or to exempt a given appropriations bill. . . .

*Id.* at 824, 117 S.Ct. 2312.

Here the plaintiff congressmen, by specifically defeating the War Powers Resolution authorization by a tie vote and by defeating a declaration of war, sought to fit within the *Coleman* exception to the *Raines* rule. This parliamentary tactic led to an extensive argument before us as to exactly what the Supreme Court meant by a claim that a legislator's vote was completely "nullified."

It is, to be sure, not readily apparent what the Supreme Court meant by that

word. It would seem the Court used nullify to mean treating a vote that did not pass as if it had, or vice versa. The "nullification" alleged in this case therefore differs from *Coleman* in a significant respect. In that case state officials endorsed a defeated ratification, treating it as approved, while the President here did not claim to be acting pursuant to the defeated declaration of war or a statutory authorization, but instead "pursuant to [his] constitutional authority to conduct U.S. foreign relations and as Commander-in-Chief and Chief Executive." *See* Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 35 Weekly Comp. Pres. Doc. 528 (March 26, 1999). The Court did not suggest in *Raines* that the President "nullifies" a congressional vote and thus legislators have standing whenever the government does something Congress voted against, still less that congressmen would have standing anytime a President allegedly acts in excess of statutory authority. As the government correctly observes, appellants' statutory argument, although cast in terms of the nullification of a recent vote, essentially is that the President violated the quarter-century old War Powers Resolution. Similarly, their constitutional argument is that the President has acted illegally—in excess of his authority—because he waged war in the constitutional sense without a congressional delegation. Neither claim is analogous to a *Coleman* nullification.

We think the key to understanding the Court's treatment of *Coleman* and its use of the word nullification is its implicit recognition that a ratification vote on a constitutional amendment is an unusual situation. It is not at all clear whether once the amendment was "deemed ratified," *see Raines*, 521 U.S. at 822, 117 S.Ct. 2312, the Kansas Senate could have done any-

thing to reverse that position.[4] We think that must be what the Supreme Court implied when it said the *Raines* plaintiffs could not allege that the "[Line Item Veto Act] would nullify their votes *in the future,*" and that, after all, a majority of senators and congressmen could always repeal the Line Item Veto Act. *Id.* at 824, 117 S.Ct. 2312 (emphasis added). The *Coleman* senators, by contrast, may well have been powerless to rescind a ratification of a constitutional amendment that they claimed had been defeated. In other words, they had no legislative remedy. Under that reading—which we think explains the very narrow possible *Coleman* exception to *Raines*—appellants fail because they continued, after the votes, to enjoy ample legislative power to have stopped prosecution of the "war."

In this case, Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign; indeed, there was a measure—albeit only a concurrent resolution—introduced to require the President to withdraw U.S. troops. Unfortunately, however, for those congressmen who, like appellants, desired an end to U.S. involvement in Yugoslavia, this measure was *defeated* by a 139 to 290 vote. Of course, Congress always retains appropriations authority and could have cut off funds for the American role in the conflict. Again there was an effort to do so but it failed; appropriations were authorized. And there always remains the possibility of impeachment should a President act in disregard of Congress' authority on these matters.

\*        \*        \*

Appellants' constitutional claim stands on no firmer footing. Appellants argue that the War Powers Clause of the Constitution proscribes a President from using

military force except as is necessary to repel a sudden attack. But they also argue that the WPR "implements" or channels congressional authority under the Constitution. It may well be then that since we have determined that appellants lack standing to enforce the WPR there is nothing left of their constitutional claim. Assuming, however, that appellants' constitutional claim should be considered separately, the same logic dictates they do not have standing to bring such a challenge. That is to say Congress has a broad range of legislative authority it can use to stop a President's war making, *see generally* John C. Yoo, *The Continuation of Politics by Other Means: The Original Understanding of War Powers,* 84 CAL. L. REV. 167 (1996), and therefore under *Raines* congressmen may not challenge the President's war-making powers in federal court.

Judge Randolph asserts that appellants lack standing because they do not claim that the President violated various statutes that depend on the existence of a war or the *imminence* of war. But that position sidesteps appellants' basic claim that the President unconstitutionally conducted a war without authority, and the logic of Judge Randolph's reasoning ("There is no suggestion that despite the vote, President Clinton *invaded* Yugoslavia by land or took some other action authorized only during a declared war.") is that if there had been a "war" appellants would have had standing. *See infra* at 22 (Randolph, J., concurring).[5] He therefore presents as an alternate reason for denying standing that the President did not "nullify" the vote against the declaration of war because he did not take any actions that constitute "war" in the constitutional sense. *See id.* at 20–22. That analysis, however, conflates standing with the merits. At the

---

4. *See Coleman,* 307 U.S. at 450, 59 S.Ct. 972 ("[T]he question of the efficacy of ratifications of state legislatures, in the light of ... attempted withdrawal, should be regarded as a political question. ... ").

5. It is certainly not logically necessary for appellants to assert a violation of the statutes (three of which do not even depend on a declaration of war) relied upon by the concurrence in order to make their constitutional claim.

standing stage we must take as correct appellants' claim that the President violated the Constitution simply by ordering U.S. forces to attack Yugoslavia.

In our view Judge Randolph's criticism of our analysis does not give sufficient attention to *Raines'* focus on the political self-help available to congressmen. *See infra* at 23 (Randolph, J., concurring). Even though the congressmen in *Raines* sought review before the Court of what was soon after determined in *Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), to be an unconstitutional statute, the Court denied them standing as congressmen because they possessed political tools with which to remedy their purported injury. Our colleague notes a distinction drawn by *Raines* between "the right to vote in the future [and] the nullification of a vote in the past," *see infra* at 23 (Randolph, J., concurring), and asserts that the former does not remedy the latter. But *Raines* rejected this argument, which is why the congressmen in *Raines* lacked standing whereas petitioners in *New York* were allowed to contest the President's "nullification" of particular appropriations line items. Indeed, *Raines* explicitly rejected Judge Randolph's argument that legislators should not be required to turn to politics instead of the courts for their remedy. Although the plaintiff legislators in *Raines* had already failed to stop passage of the Line Item Veto Act, the Court's

response was the equivalent of "if at first you don't succeed, try and try again"—either work for repeal of the Act, or seek to have individual spending bills made exempt. *See Raines*, 521 U.S. at 824–25, 825 n. 9, 830. Judge Randolph overlooks this key portion of *Raines* when he disagrees with our conclusion that plaintiffs lack standing because they may "fight again tomorrow." *Infra* at 23 (Randolph, J., concurring).[6]

\*    \*    \*

Accordingly, the district court is affirmed; appellants lack standing.

SILBERMAN, Circuit Judge, concurring:

Appellants argued that we should consider in our standing analysis that if congressmen lack standing only military personnel might be able to challenge a President's arguably unlawful use of force, and it would be undesirable to put the armed forces in such a position. Although that is not a consideration that bears on standing, *see Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), that argument leads me to observe that, in my view, no one is able to bring this challenge because the two claims are not justiciable. We lack "judicially discoverable and manageable standards" for addressing them, and the War Powers Clause claim implicates the

---

**6.** Judge Randolph also contends that our opinion is in conflict with *Chenoweth v. Clinton*, 181 F.3d 112, 116–17 (D.C.Cir.1999). But as we have already described that opinion, *see supra* at 21, it too focused on the political options available to congressmen when denying them standing. *Chenoweth* did not hold, as Judge Randolph would have it, that *Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974), survived *Raines*. Instead, we stressed the increased emphasis placed by such post-*Kennedy* cases as *Raines* on separation of powers concerns. *See Chenoweth*, 181 F.3d at 113–15. Although appellants' injury in *Chenoweth* was "precisely the harm we held in ... *Kennedy* to be cognizable under Article III," it was also "identical to the inju-

ry the Court in *Raines* deprecated as 'widely dispersed' and 'abstract,' " and therefore we affirmed the district court's dismissal for lack of standing. *Id.* We only suggested tentatively that *"Kennedy may* remain good law ... as a peculiar application of the narrow rule announced in" *Coleman. See id.* at 116 (emphasis added). Indeed, Judge Tatel understandably read our opinion to "essentially overrule[ ] the theory of legislative standing recognized in *Kennedy....*" *See id.* at 117 (Tatel, J., concurring). In any event, *Chenoweth's* discussion of *Kennedy's* fate after *Raines* was dicta, and we need not decide for purposes of this case if *Kennedy,* which involved the special question of a pocket veto, survived *Raines.*

political question doctrine. *See Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Prior litigation under the WPR has turned on the threshold test whether U.S. forces are engaged in hostilities or are in imminent danger of hostilities. But the question posed by appellants—whether the President's refusal to discontinue American activities in Yugoslavia violates the WPR—necessarily depends on the statute having been triggered in the first place. It has been held that the statutory threshold standard is not precise enough and too obviously calls for a political judgment to be one suitable for judicial determinations. *See, e.g., Sanchez-Espinoza v. Reagan,* 770 F.2d 202, 209 (D.C.Cir.1985) (aid to Contras); *Crockett v. Reagan,* 720 F.2d 1355, 1356–57 (D.C.Cir.1983) (U.S. advisors in El Salvador); *see also Ange v. Bush,* 752 F.Supp. 509, 514 (D.D.C.1990) (pre-Gulf War buildup); *Lowry v. Reagan,* 676 F.Supp. 333, 340 n. 53 (D.D.C.1987) (reflagging operations in the Persian Gulf). I think that is correct. Appellants point to a House Report suggesting that hostilities for purposes of the WPR include all situations "where there is a reasonable expectation that American military personnel will be subject to hostile fire." *See* H.R. REP. No. 287, 93rd Cong., 1st Sess. 7 (1973). That elaboration hardly helps. It could reasonably be thought that anytime American soldiers are confronted by armed or potentially armed forces of a non-ally there is a reasonable expectation that they will be subject to hostile fire. Certainly any competent military leader will assume that to be so.

Appellants argue that here there is no real problem of definition because this air war was so overwhelming and indisputa-ble. It is asserted that the President implicitly conceded the applicability of the WPR by sending the report to Congress. In truth, the President only said the report was "consistent" with the WPR. In any event, I do not think it matters how clear it is in any particular case that "hostilities" were initiated if the statutory standard is one generally unsuited to judicial resolution.

Nor is the constitutional claim justiciable. Appellants contend this case is governed by *Mitchell v. Laird,* 488 F.2d 611, 614 (D.C.Cir.1973), where we said that "[t]here would be no insuperable difficulty in a court determining whether" the Vietnam conflict constituted a war in the Constitutional sense. *See also Dellums v. Bush,* 752 F.Supp. 1141, 1146 (D.D.C.1990) ("[T]he Court has no hesitation in concluding that an offensive entry into Iraq by several hundred thousand United States servicemen ... could be described as a 'war' within the meaning ... of the Constitution."). But a careful reading of both cases reveals that the language upon which appellants rely is only dicta. (In *Laird* the Court ultimately held that the resolution of the issues was a political question. *See* 488 F.2d at 616.) [1]

Appellants cannot point to any constitutional test for what is war. *See, e.g., Holtzman v. Schlesinger,* 414 U.S. 1316, 94 S.Ct. 8, 38 L.Ed.2d 28 (1973) (Justice Douglas, in chambers, vacating order of Court of Appeals granting stay of district court's injunction against bombing of Cambodia), 414 U.S. at 1321, 94 S.Ct. 8 (1973) (Justice Marshall, in chambers, granting stay the same day with the concurrence of the other Justices); *Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir.1973) (holding

---

1. The additional cases upon which Judge Tatel relies with respect to this point were also held to present political questions. *See Massachusetts v. Laird,* 451 F.2d 26, 34 (1st Cir. 1971) ("All we hold here is that in a situation of prolonged but undeclared hostilities, where the executive continues to act not only in the absence of any conflicting congressional claim of authority but with steady congres-sional support, the Constitution has not been breached."); *Orlando v. Laird,* 443 F.2d 1039, 1043 (2d Cir.1971) (whether Vietnam conflict required a declaration of war was a political question); *Berk v. Laird,* 429 F.2d 302 (2d Cir.1970) (denying a preliminary injunction against dispatch of soldier to Vietnam because whether Congress had authorized conflict was a political question).

legality of Cambodia bombing nonjusticiable because courts lack expertise to determine import of various military actions). Instead, appellants offer a rough definition of war provided in 1994 by an Assistant Attorney General to four Senators with respect to a planned intervention in Haiti, as well as a number of law review articles each containing its own definition of war. I do not think any of these sources, however, offers a coherent test for judges to apply to the question what constitutes war, a point only accentuated by the variances, for instance, between the numerous law review articles. For that reason, I disagree with Judge Tatel's assertion that we can decide appellants' constitutional claim because it is somehow obvious in this case that our country fought a war. *See infra* at 22 (Tatel, J., concurring). *Baker v. Carr* speaks of a case involving "a lack of judicially discoverable and manageable standards for resolving" the issue presented, *see* 369 U.S. at 217, 82 S.Ct. 691, not just a case the facts of which are obscure; the focus is on the standards. Even if this court knows all there is to know about the Kosovo conflict, we still do not know what standards to apply to those facts.

Judge Tatel points to numerous cases in which a court has determined that our nation was at war, but none of these cases involved the question whether the President had "declared war" in violation of the Constitution. For instance, in *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 1 L.Ed. 731 (1800), the question whether there was a "war" was only relevant to determining whether France was an "enemy" within the meaning of a prize statute. *See id.* at 37 ("[T]he argument turned, principally, upon two inquiries: 1st. Whether the Act of March 1799, applied only to the event of a future general war? 2d. Whether France was *an enemy* of the United States, within the meaning of the law?"). Indeed, Justice Washington's opinion in that case, upon which Judge Tatel principally relies, suggests that whether there was a war in the constitutional sense was irrelevant. *See id.* at 42 ("Besides, it may be asked, why

should the rate of salvage be different in such a war as the present, from the salvage in a war more solemn [*i.e.* a declared war] or general?"). It is similarly irrelevant that courts have determined the existence of a war in cases involving insurance policies and other contracts, the Federal Tort Claims Act, and provisions of the military criminal code applicable in "time of war." *See infra* at 20–21 (Tatel, J., concurring). None of these cases asked whether there was a war as the Constitution uses that word, but only whether a particular statutory or contractual provision was triggered by some instance of fighting. Comparing *Bas v. Tingy*'s lengthy discussion whether our quarrel with France constituted a solemn or imperfect, general or limited war, *see* 4 U.S. at 40–41, with today's propensity to label any widespread conflict an undifferentiated war, it would not be surprising if an insurance contract's "war" provisions, or even a statute's for that matter, were triggered before the Constitution's.

Even assuming a court could determine what "war" is, it is important to remember that the Constitution grants Congress the power to declare war, which is not necessarily the same as the power to determine whether U.S. forces will fight in a war. This distinction was drawn in the *Prize Cases*, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862). There, petitioners challenged the authority of the President to impose a blockade on the secessionist States, an act of war, where Congress had not declared war against the Confederacy. The Court, while recognizing that the President "has no power to initiate or declare a war," observed that "war may exist without a declaration on either side." *Id.* at 668. In instances where war is declared against the United States by the actions of another country, the President "does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority." *Id.* Importantly, the Court made clear that it would not dispute the President on measures necessary to

repel foreign aggression. The President alone

> must determine what degree of force the crisis demands. The proclamation of blockade is itself official and conclusive evidence to the Court that a state of war existed which demanded and authorized a recourse to such a measure, under the circumstances peculiar to the case.

*Id.* at 670.[2] And, to confirm the independent authority of the President to meet foreign aggression, the Court noted that while Congress had authorized the war, it may not have been required to: "*If* it were necessary to the technical existence of a war, that it should have a legislative sanction, we find it. . . ." *Id.* (emphasis added).

I read the *Prize Cases* to stand for the proposition that the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization, and courts may not review the level of force selected. *See* Geoffrey Corn, *Presidential War Power: Do the Courts Offer Any Answers?*, 157 MIL. L. REV. 180, 214 (1998); J. Gregory Sidak, *To Declare War*, 41 DUKE L.J. 27, 54 (1991); Cyrus R. Vance, *Striking the Balance: Congress and the President Under the War Powers Resolution*, 133 U. PA. L. REV. 79, 85 (1984). Therefore, I assume, *arguendo*, that appellants are correct and only Congress has authority to *initiate* "war." If the President may direct U.S. forces in response to third-party initiated war, then the question any plaintiff who challenges the constitutionality of a war must answer is, who started it? The

question of who is responsible for a conflict is, as history reveals, rather difficult to answer, and we lack judicial standards for resolving it. *See, e.g., Greenham Women Against Cruise Missiles v. Reagan,* 591 F.Supp. 1332, 1337–38 (S.D.N.Y.1984) (court lacked judicially manageable standards to decide if placement of U.S. cruise missiles in England was a war-like, "aggressive" act). Then there is the problem of actually discovering the necessary information to answer the question, when such information may be unavailable to the U.S. or its allies, or unavailable to courts due to its sensitivity. *See id.* at 1338. Perhaps Yugoslavia did pose a threat to a much wider region of Europe and to U.S. civilian and military interests and personnel there.

Judge Tatel does not take into account the *Prize Cases* when he concludes that the President was not exercising his independent authority to respond to foreign aggression because "in fact, the Kosovo issue had been festering for years." *See infra* at 22 (Tatel, J., concurring). As quoted above the President alone "must determine what degree of force the crisis demands." *See* 67 U.S. at 670. Judge Tatel would substitute our judgment for the President's as to the point at which an intervention for reasons of national security is justified; after which point—when the crisis is no longer acute—the President must obtain a declaration of war. One should bear in mind that Kosovo's tensions antedate the creation of this republic.

In most cases this will also be an issue of the greatest sensitivity for our foreign relations. Here, the President claimed on

2. Judge Tatel's reliance on the *Prize Cases* as an example of the Court concluding a war exists is misplaced because the Court itself did not label the Civil War such, but instead deferred to the President's determination that the country was at war. *See* 67 U.S. (2 Black) at 670 ("Whether the President in fulfilling his duties, as Commander-in-chief . . . has met with such armed hostile resistance . . . as will compel him to accord to them the character of belligerents, is a question to be decided by *him,* and this Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted") (emphasis in original). Therefore, the Court's assertion that "it is bound to notice and to know" the war, *see id.* at 667, provides no support for the proposition that a court itself may decide when in fact there is one. The *Prize Cases* thus refute the suggestion in *Talbot v. Seeman,* 5 U.S. (1 Cranch) 1, 28, 2 L.Ed. 15 (1801), that only acts of Congress are evidence of the existence of a war. *See infra* at 20 (Tatel, J., concurring).

national television that our country needed to respond to Yugoslav aggression to protect our trading interests in Europe, and to prevent a replay of World War I. A pronouncement by another branch of the U.S. government that U.S. participation in Kosovo was "unjustified" would no doubt cause strains within NATO. *Cf. United States v. New*, 50 M.J. 729, 739–40 (Army Ct.Crim.App.1999) (lawfulness of U.N. peacekeeping operation in Macedonia was a political question).

In sum, there are no standards to determine either the statutory or constitutional questions raised in this case, and the question of whether the President has intruded on the war-declaring authority of Congress fits squarely within the political question doctrine. We therefore have another basis for our affirming the district court's dismissal of appellants' case.

RANDOLPH, Circuit Judge, concurring in the judgment:

The majority opinion does not, I believe, correctly analyze plaintiffs' standing to sue. It misconceives the holding of *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), and conflicts with the law of this circuit. I believe

---

1. While we may be required to decide jurisdictional issues before disposing of a case on the merits, we are not required to decide jurisdictional questions in any particular order. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Galvan v. Federal Prison Indus., Inc.*, 199 F.3d 461 (D.C.Cir. 1999) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Ruhrgas A.G. v. Marathon Oil Co.*, 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)). Specifically, we may assume standing when dismissing a case as moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, —— U.S. ——, at ——, 120 S.Ct. 693, 703–04, —— L.Ed.2d —— (2000) (citing *Arizonans*, 520 U.S. at 66–67, 117 S.Ct. 1055).

2. I include as an Addendum to this opinion President Nixon's 1973 message to the House of Representatives explaining why he vetoed the War Powers Resolution on the grounds of its unconstitutionality.

---

plaintiffs lack standing, at least to litigate their constitutional claim, but for reasons the majority opinion neglects. I also believe that the case is moot, an optional disposition of the appeal.[1] The serious questions about the constitutionality of the War Powers Resolution[2] must therefore be put off for still another day.

## I. Standing

The Constitution reserves the power to declare "war"[3] to Congress and delegates the power to conduct war to the President. *Compare* U.S. CONST. art. I, § 8, cl. 11, *with id.* art. II, § 2. When President Clinton committed armed forces to the attack on the Federal Republic of Yugoslavia, he did so without a declaration of war from Congress. On April 28, 1999, after air operations and missile strikes were underway, the House of Representatives voted 427 to 2 against a declaration of war. *See* H.R.J. Res. 44, 106th Cong. (1999); 126 CONG. REC. H2440–41 (daily ed. Apr. 28, 1999).

The War Powers Resolution, passed over President Nixon's veto in 1973, implements Congress's power to declare war under the Constitution. *See* 50 U.S.C. § 1541(a)-(b). It commands the President

---

3. *War* may be defined [as] the exercise of violence under sovereign command against withstanders; force, authority and resistance being the essential parts thereof. Violence, limited by authority, is sufficiently distinguished from robbery, and like outrages; yet consisting in relation towards others, it necessarily requires a supposition of resistance, whereby the force of *war* becomes different from the violence inflicted upon slaves or yielding malefactors.

SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (facsimile ed., Times Books, Ltd., London 1978) (1755). *See United States v. Bajakajian*, 524 U.S. 321, 335, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (citing Johnson); *Nixon v. United States*, 506 U.S. 224, 229–30, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (same); *see also Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 1 L.Ed. 731 (1800) (relying on Blackstone and other commentators to distinguish between perfect and imperfect wars).

to "terminate any use of United States Armed Forces" within sixty days "unless the Congress (1) has declared war or has enacted a specific authorization for such use of United States Armed Forces, (2) has extended by law such sixty-day period, or (3) is physically unable to meet as a result of an armed attack upon the United States." 50 U.S.C. § 1544(b). The Senate, on March 23, 1999, passed a concurrent resolution providing that "the President of the United States is authorized to conduct military air operations and missile strikes in cooperation with our NATO allies against the Federal Republic of Yugoslavia." S. Con. Res. 21, 106th Cong. (1999); 145 Cong. Rec. S3118 (daily ed. Mar. 23, 1999). The House rejected that measure by a tie vote on April 28, 1999. *See* 126 Cong. Rec. H2451–52 (daily ed. Apr. 28, 1999).

The Members of Congress appearing as plaintiffs contend that President Clinton violated the Constitution and the War Powers Resolution and that they are entitled to a judicial declaration so stating. They have standing, they say, because President Clinton's prosecution of the war "completely nullified" their votes against declaring war and against authorizing a continuation of the hostilities. *See* Amended Complaint ¶ 18; Brief for Plaintiffs–Appellants at 8, 16.

### A.

The quoted phrase—"completely nullified"—is from *Raines v. Byrd*, 521 U.S. 811, 823, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), giving the Court's appraisal of the

rule in *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). The majority opinion in our case seems to assume that the only thing left of legislative standing is whatever *Raines* preserves. I will not quarrel with the assumption, at least for cases in which a legislator is claiming that his vote has been illegally nullified.[4] The heart of the *Raines* decision is this: "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." 521 U.S. at 823, 117 S.Ct. 2312.[5]

Here, plaintiffs had the votes "sufficient to defeat" "a specific legislative action"—they defeated a declaration of war (their constitutional claim) and they blocked a resolution approving the President's continuation of the war (their statutory claim). To follow precisely the formulation in *Raines*, they would have standing only if the legislative actions they defeated went "into effect." Obviously, this did not happen: war was not declared, and the President never maintained that he was prosecuting the war with the House's approval.

Plaintiffs' reply is that the President's military action against Yugoslavia without congressional authorization had the effect of completely nullifying their votes, of making their votes worthless. With respect to their vote against declaring war, that clearly is not true. A congressional declaration of war carries with it profound consequences.[6] The United States Code

---

**4.** The Court has "recognized that state legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests," *Arizonans*, 520 U.S. at 65, 117 S.Ct. 1055 (citing *Karcher v. May*, 484 U.S. 72, 82, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987)). Compare *INS v. Chadha*, 462 U.S. 919, 930 n. 5, 939–40, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), in which the "Court held Congress to be a proper party to defend [a] measure's validity where both Houses, by resolution, had authorized intervention in the lawsuit," and the executive branch refused to defend

the one-House veto provision. 520 U.S. at 65 n. 20, 117 S.Ct. 1055.

**5.** A vote is "completely nullified" when it is "deprived of all validity," *Raines*, 521 U.S. at 822, 117 S.Ct. 2312, "overridden and virtually held for naught," *id.* at 822–23, 117 S.Ct. 2312, or "stripped of its validity," *id.* at 824 n. 7, 117 S.Ct. 2312.

**6.** Although the United States has committed its armed forces into combat more than a hundred times, Congress has declared war

is thick with laws expanding executive power "in time of war." *See* Office of the Judge Advocate General, United States Air Force, Digest of War and Emergency Legislation Affecting the Department of Defense 171–84 (1996) (listing statutes "effective in time of war"); *cf. id.* at 185–91 (listing statutes "effective in time of national emergency declared by the President"); *id.* at 192–98 (listing statutes "effective in time of national emergency declared by Congress").[7] Under these laws, the President's authority over industries, the use of land, and the terms and conditions of military employment is greatly enhanced.[8] A declaration of war may also have the effect of decreasing

commercial choices and curtailing civil liberties.[9] *See* William H. Rehnquist, All the Laws but One: Civil Liberties in Wartime 218–19 (1998) ("Without question the government's authority to engage in conduct that infringes civil liberty is greatest in time of declared war—the *Schenck* and *Hirabayashi* opinions make this clear.... [B]ut from the point of view of governmental authority under the Constitution, it is clear that the President may do many things in carrying out a congressional directive that he may not be able to do on his own.").

The vote of the House on April 28, 1999, deprived President Clinton of these powers. The vote against declaring war fol-

---

only five times: the War of 1812, the Mexican–American War of 1848, the Spanish–American War of 1898, World War I, and World War II. *See* Congressional Research Service, Instances of Use of United States Armed Forces Abroad, 1789–1989 (Ellen C. Collier ed., 1989), *reprinted in* Thomas M. Franck & Michael J. Glennon, Foreign Relations and National Security Law 650 (2d ed.1993); Office of the Legal Adviser, U.S. Department of State, The Legality of United States Participation in the Defense of Vietnam (1966), *reprinted in* 1 The Vietnam War and International Law 583, 597 (Richard A. Falk ed., 1968) (listing 125 incidents prior to the Vietnam Conflict).

7. In the early days of the Republic, the power of the executive in time of war was constrained by an absence of legislation. For example, in *Brown v. United States*, 12 U.S. (8 Cranch) 110, 3 L.Ed. 504 (1814), the Court rejected the argument that the President had the authority to confiscate enemy property found within the United States without explicit statutory authority even during a declared war. *See id.* at 129. The same reasoning was applied to the taking of ships on the high seas in *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 2 L.Ed. 243 (1804). Even in the wake of World War II, after Congress passed a large number of war-related measures, the Court strictly construed the President's authority. The most notable example, of course, is *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."); *cf. also Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

8. *See, e.g.,* 10 U.S.C. § 2538 (authorizing the President to "take immediate possession of any plant that is equipped to manufacture, or that ... is capable of manufacturing" war material "in time of war or when war is imminent"); 10 U.S.C. § 2644 ("In time of war, the President, through the Secretary of Defense, may take possession and assume control of all or part of any system of transportation to transport troops, war material, and equipment, or for other purposes related to the emergency."); 10 U.S.C. § 2663(b) ("In time of war or when war is imminent, the United States may, immediately upon the filing of a petition for condemnation under subsection (a), take and use the land to the extent of the interest sought to be acquired."); 50 U.S.C. § 1829 ("Notwithstanding any other provision of law, the President, through the Attorney General, may authorize physical searches without a court order ... to acquire foreign intelligence information for a period not to exceed 15 calendar days following a declaration of war by the Congress.").

9. *See, e.g.,* 18 U.S.C. § 2388(a) ("Whoever, when the United States is at war, willfully causes or attempts to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or willfully obstructs the recruiting or enlistment service of the United States, to the injury of the service or the United States, or attempts to do so—Shall be fined under this title or imprisoned not more than twenty years, or both."); 18 U.S.C. § 3287 (tolling statute of limitations for any offense involving fraud against the property of the United States until three years after the termination of hostilities).

lowed immediately upon the vote not to require immediate withdrawal. Those who voted against a declaration of war did so to deprive the President of the authority to expand hostilities beyond the bombing campaign and, specifically, to deprive him of the authority to introduce ground troops into the conflict. *See* 145 CONG. REC. H2427–41 (daily ed. Apr. 28, 1999). There is no suggestion that despite the vote, President Clinton invaded Yugoslavia by land or took some other action authorized only during a declared war. It follows that plaintiffs' votes against declaring war were not for naught. For that reason, plaintiffs do not have standing to sue on their constitutional claim.

As to their claim under the War Powers Resolution, the beauty of this measure, or one of its defects (see the Addendum to this opinion), is in its automatic operation: unless a majority of both Houses declares war, or approves continuation of hostilities beyond 60 days, or Congress is "physically unable to meet as a result of an armed attack upon the United States," the Resolution requires the President to withdraw the troops. 50 U.S.C. § 1544(b). The President has nothing to veto. Congress may allow the time to run without taking any vote, or it may—as the House did here—take a vote and fail to muster a majority in favor of continuing the hostilities.

To put the matter in terms of *Raines* once again, plaintiffs had the votes "sufficient to defeat" "a specific legislative action"—they blocked a resolution authorizing the President's continuation of the war with Yugoslavia—but it is not true, in the language of *Raines*, that this "legislative action" nevertheless went "into effect."

Congressional authorization simply did not occur. The President may have acted as if he had Congress's approval, or he may have acted as if he did not need it. Either way, plaintiffs' real complaint is not that the President ignored their votes; it is that he ignored the War Powers Resolution, and hence the votes of an earlier Congress, which enacted the law over President Nixon's veto. It is hard for me to see that this amounts to anything more than saying: "We, the members of Congress, have standing because the President violated one of our laws." To hold that Members of Congress may litigate on such a basis strikes me as highly problematic, not only because the principle is unconfined but also because it raises very serious separation-of-powers concerns. *See Raines*, 521 U.S. at 825 n. 8, 117 S.Ct. 2312; *Barnes v. Kline*, 759 F.2d 21, 41 (D.C.Cir.1985) (Bork, J., dissenting), *vacated as moot*, 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987). But because the case is moot, I need say no more.

## B.

The majority opinion analyzes standing rather differently than I do. It says plaintiffs lack standing to pursue their statutory claim because "they continued, after the votes, to enjoy ample legislative power to have stopped prosecution of the 'war.'" Maj. op. at 23. For specifics, the opinion points out that Congress defeated House Concurrent Resolution 82, a resolution requiring immediate disengagement from the conflict in Yugoslavia; that "Congress always retains appropriations authority and could have cut off funds for the American role in the conflict"; [10] and that "there

---

**10.** The majority attaches some importance to Congress's decision to authorize funding for Operation Allied Force and argues that Congress could have denied funding if it wished to end the war. However, in *Mitchell v. Laird*, 488 F.2d 611, 616 (D.C.Cir.1973), we held that, as "every schoolboy knows," Congress may pass such legislation, not because it is in favor of continuing the hostilities, but because it does not want to endanger soldiers in the field. The War Powers Resolution itself makes the same point: "Authority to introduce United States Armed Forces into hostilities or into situations wherein involvement in hostilities is clearly indicated by the circumstances *shall not be inferred* ... from any provision of law (whether or not in effect before November 7, 1973), *including any provision contained in any appropriation Act,* unless such provision specifically authorizes the

always remains the possibility of impeachment." *Id.*[11] The same reason—the possibility of future legislative action—is used to defeat plaintiffs' standing with respect to their constitutional claim. *Id.* at 23.

The majority has, I believe, confused the right to vote in the future with the nullification of a vote in the past, a distinction *Raines* clearly made. *See* 521 U.S. at 824, 117 S.Ct. 2312. To say that your vote was not nullified because you can vote for other legislation in the future is like saying you did not lose yesterday's battle because you can fight again tomorrow. The Supreme Court did not engage in such illogic. When the Court in *Raines* mentioned the possibility of future legislation, it was addressing the argument that "the [Line Item Veto] Act will nullify the [Congressmen's] votes in the future...." *Id.* This part of the Court's opinion, which the majority adopts here, is quite beside the point to our case. No one is claiming that their votes on future legislation will be impaired or nullified or rendered ineffective.

Besides, as long as Congress and the Constitution exist, Members will always be able to vote for legislation. And so the majority's decision is tantamount to a decision abolishing legislative standing. I have two problems with this. First, if we are going to get rid of legislative standing altogether, we ought to do so openly and not under the cover of an interpretation, or rather misinterpretation, of a phrase in *Raines*. If the Supreme Court had meant to do away with legislative standing, it would have said so and it would have given reasons for taking that step.

My second problem is just as serious, perhaps more so: the majority's decision conflicts with this court's latest legislative standing decision. In *Chenoweth v. Clinton*, 181 F.3d 112, 116–17 (D.C.Cir.1999), we interpreted *Raines* consistently with my analysis in this case and concluded that a previous legislative standing decision of this court—*Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974)—upholding legislative standing to challenge the legality of a pocket veto was still good law. The plaintiff in *Kennedy* had standing under the proper interpretation of *Raines*, we held, because the "pocket veto challenged in that case had made ineffective a bill that both houses of the Congress had approved. Because it was the President's veto—not a lack of legislative support—that prevented the bill from becoming law (either directly or by the Congress voting to override the President's veto), those in the majority could plausibly describe the President's action as a complete nullification of their votes." 181 F.3d at 116–17. If *Chenoweth* is correct, the majority opinion in this case must be wrong. If *Chenoweth* is correct, it is no answer to say—as the majority says in this case—that standing is lacking because, despite the pocket veto, Congress could pass the same law again, or it could retaliate by cutting off appropriations for the White House or it could impeach the President.

## C.

My position, the majority complains, "sidesteps" plaintiffs' merits "claim that

introduction of United States Armed Forces into hostilities or into such situations and states that it is intended to constitute specific statutory authorization within the meaning of this chapter." 50 U.S.C. § 1547(a)(1) (emphasis added). Those portions of the Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, 113 Stat. 57, relating to the attacks on Yugoslavia specified the limited purpose for the emergency appropriations, but contained no language even roughly approximating that required by the War Powers Resolution. *See id.*, ch. 3, 113 Stat. 76–83.

11. These are not the only possibilities. "It has been thought that Congress could constitutionally cut the President's salary in half and auction off the White House, reduce the President's staff to one secretary, and limit her or him to answering personal correspondence." A. Raymond Randolph, *Introduction—Disciplining Congress: The Boundaries of Legislative Power*, 13 J.L. & Pol. 585, 586 (1997).

the President unconstitutionally conducted a war without authority," Maj. op. at 23. This is meant to be criticism? A properly-conducted standing analysis almost always avoids—sidesteps—a decision on the merits.[12] In the next breath, the majority turns around and contradicts itself, proclaiming that my analysis "conflates standing with the merits." *Id.* I am familiar with what I have written. I do not recall having rendered a judgment about whether the President violated the Constitution. The careful reader will, I think, agree with me. Nor do I present "as an alternative reason for denying standing that the President did not ... take any actions constituting war in the constitutional sense." *Id.* The majority's sentence is doubly misleading. Here is my alternative reason for denying standing, pure. and simple: regardless whether President Clinton waged a "war," plaintiffs never claimed that he exercised statutory authority reserved to him only when Congress has declared a war; and so their votes against declaring war cannot be considered a nullity. Thus, one, I have taken no position on whether the President engaged in a "war," and two, I say only that plaintiffs never *alleged* that the President utilized these statutory powers. Too often a strategy in legal argumentation is to pretend to answer an argument by misstating it.[13] My argument remains unanswered. All the majority has done is to misstate it almost as badly as it has misread *Raines*.

## II. Mootness

The amended complaint, filed on May 19, 1999, sought a declaratory judgment "that no later than May 25, 1999, the Pres-

ident must terminate the involvement of the United States Armed Forces in such hostilities unless Congress declares war, or enacts other explicit authorization, or has extended the sixty day period." Amended Complaint at 12; *see* 50 U.S.C. § 1544(b)(1)-(2). All agree that the "hostilities" ended by June 21, 1999, after NATO's Secretary General announced the official termination of the air campaign and Secretary of Defense Cohen announced the redeployment of more than 300 ·U.S. aircraft back to their home bases.

To save their case from mootness, plaintiffs therefore invoke the rule regarding issues "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v.˙ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Christian Knights of the Ku Klux Klan v. District of Columbia*, 972 F.2d 365, 369–71 (D.C.Cir.1992). Plaintiffs must, but cannot, satisfy both elements to prevail. Their constitutional and statutory claims are at cross purposes.

The "evading review" part of the formulation is temporal. How quickly must an activity begin and end to evade judicial review? This depends on which court does the reviewing. The Supreme Court has treated the matter in terms of itself. Hence evading review means evading Supreme Court review, *see Christian Knights*, 972 F.2d at 369, which can be (though usually is not) swift review. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Some undeclared wars, or in the euphemism of the day, "hostilities," are over quickly; others, like the Korean War·and the war in

---

12. The majority drops this footnote: "It is certainly not logically necessary for appellants to assert a violation of the statutes ... relied upon by the concurrence in order to make their constitutional claim." Maj. op. at 23 n.5. How strange a statement. I refer to the statutes not in the context of plaintiffs' making their constitutional claim, but in regard to their standing to litigate that claim. It is as if the majority had made this brow-

furrowing statement: "in order to make out their constitutional claim, it is not logically necessary for plaintiffs to assert that their votes were nullified within the meaning of *Raines.*"

13. See also the sentence attributing to me the "argument that legislators should not be required to turn to politics instead of the courts for their remedy." Maj. op. at 24. There are other examples not worth mentioning.

Vietnam, last for years. Circuit precedent requires us to determine whether the activity challenged is "inherently" of a sort that evades review; circuit precedent also holds that "offensive wars initiated without congressional approval" are not in that category. *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C.Cir.1985). That holding, which remains the law of the circuit, means that we must treat plaintiffs' claims as moot.

Plaintiffs' statutory claim—that President Clinton continued the war for more than 60 days without congressional authorization, in violation of the War Powers Resolution—also may not satisfy the "capable of repetition" element. There is an aspect of probability involved here. "By 'capable of repetition' the Supreme Court means 'a reasonable expectation that the same complaining party would be subject to the same action again.'" *Christian Knights*, 972 F.2d at 370 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam)).[14] This introduces some complications. Who should be considered the "same complaining parties"? And what is the "same action again"?

The same "complaining parties" must refer to the individual Members of Congress who brought this suit. They have sued in their official capacity and, as in *Karcher v. May*, 484 U.S. 72, 79–81, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987), the injury they allege relates to their conduct as legislators. Thus, in assessing the likelihood of a recurrence of "the same action," the inquiry must be restricted only to the period in which these Congressmen would likely remain in office. As to the "same action," this refers to President Clinton's alleged violation of the War Powers Resolution by continuing hostilities for more than 60 days without Congress's affirmative approval. How likely is that to recur? Not very, if history is any guide. The War Powers Resolution has been in effect for a quarter of a century. Yet President Clinton is the first President who arguably violated the 60–day provision. In order to show why their claims will "evade review," plaintiffs tell us that, in modern times, United States attacks on foreign nations will be over quickly, by which they mean less than 60 days.[15] Accepting that prediction as accurate dooms their case. It means that the likelihood of this President, or some other, violating the 60–day provision of the War Powers Resolution is remote, not only because we can expect other Presidents to obtain congressional approval for wars lasting more than 60 days, but also because most military actions in the future (as plaintiffs agree) will be over before the 60–day limit for undeclared or unauthorized wars has been exceeded.

## ADDENDUM

Veto of War Powers Resolution

*The President's Message to the House of Representatives Returning H.J. Res. 542 Without His Approval. October 24, 1973*

*To the House of Representatives:*

I hereby return without my approval House Joint Resolution 542—the War

---

**14.** The Supreme Court recently stated that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, — U.S. at —, 120 S.Ct. at 709 (citing *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). The President's cessation of the attack on Yugoslavia was not "voluntary" within the Court's meaning; the war ended because the United States won, not because the President sought to avoid litigation.

**15.** "The 1998 air attack against Afghanistan and Sudan, the December 1998 air attacks against Iraq, the 1995 air assault against the Bosnian Serbs, the 1994 Haitian invasion, the 1991 Persian Gulf War, the 1989 Panama invasion, the 1986 air attack against Libya, the 1983 Grenada attack were all completed in less than 60 days." Reply Brief for Plaintiffs–Appellants at 5–6.

Powers Resolution. While I am in accord with the desire of the Congress to assert its proper role in the conduct of our foreign affairs, the restrictions which this resolution would impose upon the authority of the President are both unconstitutional and dangerous to the best interests of our Nation.

The proper roles of the Congress and the Executive in the conduct of foreign affairs have been debated since the founding of our country. Only recently, however, has there been a serious challenge to the wisdom of the Founding Fathers in choosing not to draw a precise and detailed line of demarcation between the foreign policy powers of the two branches.

The Founding Fathers understood the impossibility of foreseeing every contingency that might arise in this complex area. They acknowledged the need for flexibility in responding to changing circumstances. They recognized that foreign policy decisions must be made through close cooperation between the two branches and not through rigidly codified procedures.

These principles remain as valid today as they were when our Constitution was written. Yet House Joint Resolution 542 would violate those principles by defining the President's powers in ways which would strictly limit his constitutional authority.

*Clearly Unconstitutional*

House Joint Resolution 542 would attempt to take away, by a mere legislative act, authorities which the President has properly exercised under the Constitution for almost 200 years. One of its provisions would automatically cut off certain authorities after sixty days unless the Congress extended them. Another would allow the Congress to eliminate certain authorities merely by the passage of a concurrent resolution—an action which does not normally have the force of law, since it denies the President his constitutional role in approving legislation.

I believe that both these provisions are unconstitutional. The only way in which the constitutional powers of a branch of the Government can be altered is by amending the Constitution—and any attempt to make such alterations by legislation alone is clearly without force.

*Undermining Our Foreign Policy*

While I firmly believe that a veto of House Joint Resolution 542 is warranted solely on constitutional grounds, I am also deeply disturbed by the practical consequences of this resolution. For it would seriously undermine this Nation's ability to act decisively and convincingly in times of international crisis. As a result, the confidence of our allies in our ability to assist them could be diminished and the respect of our adversaries for our deterrent posture could decline. A permanent and substantial element of unpredictability would be injected into the world's assessment of American behavior, further increasing the likelihood of miscalculation and war.

If this resolution had been in operation, America's effective response to a variety of challenges in recent years would have been vastly complicated or even made impossible. We may well have been unable to respond in the way we did during the Berlin crisis of 1961, the Cuban missile crisis of 1962, the Congo rescue operation in 1964, and the Jordanian crisis of 1970—to mention just a few examples. In addition, our recent actions to bring about a peaceful settlement of the hostilities in the Middle East would have been seriously impaired if this resolution had been in force.

While all the specific consequences of House Joint Resolution 542 cannot yet be predicted, it is clear that it would undercut the ability of the United States to act as an effective influence for peace. For example, the provision automatically cutting off certain authorities after 60 days unless they are extended by the Congress could work to prolong or intensify a crisis. Until the Congress suspended the deadline,

there would be at least a chance of United States withdrawal and an adversary would be tempted therefore to postpone serious negotiations until the 60 days were up. Only after the Congress acted would there be a strong incentive for an adversary to negotiate. In addition, the very existence of a deadline could lead to an escalation of hostilities in order to achieve certain objectives before the 60 days expired.

The measure would jeopardize our role as a force for peace in other ways as well. It would, for example, strike from the President's hand a wide range of important peace-keeping tools by eliminating his ability to exercise quiet diplomacy backed by subtle shifts in our military deployments. It would also cast into doubt authorities which Presidents have used to undertake certain humanitarian relief missions in conflict areas, to protect fishing boats from seizure, to deal with ship or aircraft hijackings, and to respond to threats of attack. Not the least of the adverse consequences of this resolution would be the prohibition contained in section 8 against fulfilling our obligations under the NATO treaty as ratified by the Senate. Finally, since the bill is somewhat vague as to when the 60 day rule would apply, it could lead to extreme confusion and dangerous disagreements concerning the prerogatives of the two branches, seriously damaging our ability to respond to international crises.

*Failure to Require Positive Congressional Action*

I am particularly disturbed by the fact that certain of the President's constitutional powers as Commander in Chief of the Armed Forces would terminate automatically under this resolution 60 days after they were invoked. No overt Congressional action would be required to cut off these powers—they would disappear automatically unless the Congress extended them. In effect, the Congress is here attempting to increase its policy-making role through a provision which requires it to take absolutely no action at all.

In my view, the proper way for the Congress to make known its will on such foreign policy questions is through a positive action, with full debate on the merits of the issue and with each member taking the responsibility of casting a yes or no vote after considering those merits. The authorization and appropriations process represents one of the ways in which such influence can be exercised. I do not, however, believe that the Congress can responsibly contribute its considered, collective judgment on such grave questions without full debate and without a yes or no vote. Yet this is precisely what the joint resolution would allow. It would give every future Congress the ability to handcuff every future President merely by doing nothing and sitting still. In my view, one cannot become a responsible partner unless one is prepared to take responsible action.

*Strengthening Cooperation Between the Congress and the Executive Branches*

The responsible and effective exercise of the war powers requires the fullest cooperation between the Congress and the Executive and the prudent fulfillment by each branch of its constitutional responsibilities. House joint Resolution 542 includes certain constructive measures which would foster this process by enhancing the flow of information from the executive branch to the Congress. Section 3, for example, calls for consultations with the Congress before and during the involvement of the United States forces in hostilities abroad. This provision is consistent with the desire of this Administration for regularized consultations with the Congress in an even wider range of circumstances.

I believe that full and cooperative participation in foreign policy matters by both the executive and the legislative branches could be enhanced by a careful and dispassionate study of their constitutional roles. Helpful proposals for such a study have already been made in the Congress. I would welcome the establishment of a non-

partisan commission on the constitutional roles of the Congress and the President in the conduct of foreign affairs. This commission could make a thorough review of the principal constitutional issues in Executive-Congressional relations, including the war powers, the international agreement powers, and the question of Executive privilege, and then submit its recommendations to the President and the Congress. The members of such a commission could be drawn from both parties—and could represent many perspectives including those of the Congress, the executive branch, the legal profession, and the academic community.

This Administration is dedicated to strengthening cooperation between the Congress and the President in the conduct of foreign affairs and to preserving the constitutional prerogatives of both branches of our Government. I know that the Congress shares that goal. A commission on the constitutional roles of the Congress and the President would provide a useful opportunity for both branches to work together toward that common objective.

RICHARD NIXON

The White House,
October 24, 1973.

TATEL, Circuit Judge, concurring:

Although I agree with Judge Silberman that *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), as interpreted by this court in *Chenoweth v. Clinton*, 181 F.3d 112 (D.C.Cir.1999), deprives plaintiffs of standing to bring this action, I do not share his view that the case poses a nonjusticiable political question. *See supra* (Silberman, J., concurring). In my view, were this case brought by plaintiffs with standing, we could determine whether the President, in undertaking the air campaign in Yugoslavia, exceeded his authority under the Constitution or the War Powers Resolution.

To begin with, I do not agree that courts lack judicially discoverable and manageable standards for "determining the existence of a 'war.'" Brief of Appellee at 36. *See also supra* at 24–25 (Silberman, J., concurring). Whether the military activity in Yugoslavia amounted to "war" within the meaning of the Declare War Clause, U.S. CONST. art. I, § 8, cl. 11, is no more standardless than any other question regarding the constitutionality of government action. Precisely what police conduct violates the Fourth Amendment guarantee "against unreasonable searches and seizures?" When does government action amount to "an establishment of religion" prohibited by the First Amendment? When is an election district so bizarrely shaped as to violate the Fourteenth Amendment guarantee of "equal protection of the laws?" Because such constitutional terms are not self-defining, standards for answering these questions have evolved, as legal standards always do, through years of judicial decisionmaking. Courts have proven no less capable of developing standards to resolve war powers challenges.

Since the earliest years of the nation, courts have not hesitated to determine when military action constitutes "war." In *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 1 L.Ed. 731 (1800), the Supreme Court had to decide whether hostilities between France and the United States amounted to a state of war in order to resolve disputes over captured ships. Because outright war had not been declared, the justices examined both the facts of the conflict ("the scene of bloodshed, depredation and confiscation, which has unhappily occurred," *id.* at 39) and the acts of Congress that had authorized limited military action:

> In March 1799, congress had raised an army; stopped all intercourse with France; dissolved our treaty; built and equipt ships of war; and commissioned private armed ships; enjoining the former, and authorising the latter, to defend themselves against the armed ships of France, to attack them on the high seas, to subdue and take them as prize,

and to re-capture armed vessels found in their possession.

*Id.* at 41. Given these events, Justice Bushrod Washington concluded that France and the United States were at war both "[i]n fact and in law." *Id.* at 42. "If they were not our enemies," he said, "I know not what constitutes an enemy." *Id.* at 41. One year later, Chief Justice Marshall, focusing on the same conflict with France, said: "The whole powers of war being, by the constitution of the United States, vested in congress, the acts of that body can alone be resorted to as our guides in this enquiry.... To determine the real situation of America in regard to France, the acts of congress are to be inspected." *Talbot v. Seeman,* 5 U.S. (1 Cranch) 1, 28, 2 L.Ed. 15 (1801).

Half a century later, in *The Prize Cases,* 67 U.S. (2 Black) 635, 666, 17 L.Ed. 459 (1862), the Court had to determine whether a state of war, though undeclared, existed "*de facto*" between the United States and the confederacy, and if so, whether it justified the U.S. naval blockade of confederate ports. "As a civil war is never publicly proclaimed, ... its actual existence is a fact in our domestic history which the Court is bound to notice and to know." *Id.* at 667. There was no formal declaration of war, the Court explained, because the Constitution does not permit Congress to "declare war against a State, or any number of States." *Id.* at 668. Yet the Court, guided by the definition of war as "[t]hat state in which a nation prosecutes its right by force," *id.* at 666, determined that a state of war actually existed.

> A civil war is never solemnly declared; it becomes such by its accidents—the number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges

> them as belligerents, and the contest *a war*.

*Id.* at 666–67. In making this determination, the Court looked to the facts of the conflict, *id.,* to the acts of foreign governments recognizing the war and declaring their neutrality, *id.* at 669, and to congressional action authorizing the President's use of force, *id.* at 670–71. Given these facts, the Court refused "to affect a technical ignorance of the existence of a war, which all the world acknowledges to be the greatest civil war known in the history of the human race." *Id.* at 669.

More recent cases have also recognized the competence of courts to determine whether a state of war exists. Responding to a challenge to the constitutionality of the Vietnam War, this circuit confronted "the critical question ... whether the hostilities in Indo–China constitute *in the Constitutional sense* a 'war,' both within and beyond the meaning of that term in Article I, Section 8, Clause 11." *Mitchell v. Laird,* 488 F.2d 611, 614 (D.C.Cir.1973) (emphasis added). The court found "no insuperable difficulty in a court determining whether," given the extent of the hostilities, "there has been a war in Indo–China." *Id.* Once the war was recognized as such, the court saw no problem in "facing up to the question as to whether because of the war's duration and magnitude the President is or was without power to continue the war without Congressional approval," or "whether Congress has given, in a Constitutionally satisfactory form, the approval requisite for a war of considerable duration and magnitude." *Id.* Nor did the court hesitate to determine that once the Gulf of Tonkin resolution had been repealed, later congressional actions appropriating funds for the war and extending the draft were insufficient to "serve as a valid assent to the Vietnam war." *Id.* at 615. Given this absence of congressional approval for the war's continuation, the President had a duty to try "in good faith and to the best of his ability, to bring the war to an end as promptly as

was consistent with the safety of those fighting and with a profound concern for the durable interests of the nation—its defense, its honor, its morality." *Id.* at 616. Although the court ultimately declined to answer the question whether President Nixon was in fact fulfilling his duty to end the Vietnam War, *see id.,* it nonetheless made clear that courts are competent to adjudge the existence of war and the allocation of war powers between the President and Congress. Regardless of whether this language is dicta, *see supra* at 25 (Silberman, J., concurring), *Mitchell* supports my view that this court could resolve the war powers claims presented here. *See also, e.g., Massachusetts v. Laird,* 451 F.2d 26, 34 (1st Cir.1971) ("The war in Vietnam is a product of the jointly supportive actions of the two branches to whom the congeries of the war powers have been committed. Because the branches are not in opposition, there is no necessity of determining boundaries. Should either branch be opposed to the continuance of hostilities, however, and present the issue in clear terms, a court might well take a different view."); *Orlando v. Laird,* 443 F.2d 1039, 1042 (2d Cir. 1971) ("[T]he constitutional delegation of the war-declaring power to the Congress contains a discoverable and manageable standard imposing on the Congress a duty of mutual participation in the prosecution of war. Judicial scrutiny of that duty, therefore, is not foreclosed by the political question doctrine."); *Berk v. Laird,* 429 F.2d 302, 305 (2d Cir.1970) ("History makes clear that the congressional power 'to declare War' conferred by Article I, section 8, of the Constitution was intended as an explicit restriction upon the power of the Executive to initiate war on his own prerogative which was enjoyed by the British sovereign.... [E]xecutive officers are under a threshold constitutional duty which can be judicially identified and its breach judicially determined.") (internal quotation marks and brackets omitted).

Without undue difficulty, courts have also determined whether hostilities amount to "war" in other contexts. These have included insurance policies and other contracts, *see, e.g., Western Reserve Life Ins. Co. v. Meadows,* 152 Tex. 559, 567, 261 S.W.2d 554, 559 (1953) ("We are unwilling in deciding this case to shut our eyes to what everyone knows, that there has been ... actually and in reality a war in Korea in which the United States has been seriously engaged."); *Pan Am. World Airways, Inc. v. Aetna Casualty & Sur. Co.,* 505 F.2d 989, 1012–15 (2d Cir.1974); *Navios Corp. v. The Ulysses II,* 161 F.Supp. 932 (D.Md.1958), *aff'd,* 260 F.2d 959 (4th Cir.1958), the Federal Tort Claims Act, *see, e.g., Koohi v. United States,* 976 F.2d 1328 (9th Cir.1992) (noting that even absent a formal declaration, "no one can doubt that a state of war existed when our armed forces marched first into Kuwait and then into Iraq"); *Rotko v. Abrams,* 338 F.Supp. 46, 47–48 (D.Conn.1971), *aff'd,* 455 F.2d 992 (2d Cir.1972), and provisions of military criminal law applicable "in time of war," *see, e.g., United States v. Anderson,* 17 U.S.C.M.A. 588, 1968 WL 5425 (1968); *United States v. Ayers,* 4 U.S.C.M.A. 220, 1954 WL 2280 (1954).

Although courts have thus determined the existence of war as defined by the Constitution, statutes, and contracts, in this case plaintiffs' War Powers Resolution claim would not even require that we do so. We would need to ask only whether, and at what time, "United States Armed Forces [were] introduced into hostilities or into situations where imminent involvement in hostilities [was] clearly indicated by the circumstances." 50 U.S.C. § 1543(a)(1). On this question, the record is clear. In his report to the Speaker of the House and the President pro tempore of the Senate, transmitted "consistent with the War Powers Resolution," President Clinton stated: "on March 24, 1999, U.S. military forces, at my direction ... began a series of air strikes in the Federal Republic of Yugoslavia...." 35 Weekly Comp. Pres. Doc. 527 (March 26, 1999), available at 1999 WL 12654381. Pursuant

to the priority procedures of the War Powers Resolution, 50 U.S.C. §§ 1545–46, both houses of Congress responded by expediting consideration of resolutions to declare war, H.J. Res 44, to authorize airstrikes, S.J. Res. 20, and to withdraw troops, H. Con. Res. 82. Defense Secretary William Cohen told the Senate Armed Services Committee: "We're certainly engaged in hostilities, we're engaged in combat." Hearing on Kosovo, Senate Armed Services Comm., 106th Cong., April 15, 1999, 1999 WL 221637 (testimony of William Cohen, Secretary of Defense). President Clinton issued an Executive Order designating the region a U.S. combat zone and March 24 as "the date of the commencement of combatant activities in such zone." Exec. Order No. 13,119, 64 Fed.Reg. 18797 (Apr. 13, 1999).

The undisputed facts of this case are equally compelling with respect to plaintiffs' constitutional claim. If in 1799 the Supreme Court could recognize that sporadic battles between American and French vessels amounted to a state of war, and if in 1862 it could examine the record of hostilities and conclude that a state of war existed with the confederacy, then surely we, looking to similar evidence, could determine whether months of daily airstrikes involving 800 U.S. aircraft flying more than 20,000 sorties and causing thousands of enemy casualties amounted to "war" within the meaning of Article I, section 8, clause 11.

Determining whether a state of war exists would certainly be more difficult in situations involving more limited military force over a shorter period of time. But just as we never shrink from deciding a First Amendment case simply because we can imagine a more difficult one, the fact that a challenge to a different military action might present a closer question would not justify abdicating our responsibility to construe the law and apply it to the facts of this case.

Nor is the question nonjusticiable because the President, as Commander in Chief, possesses emergency authority to use military force to defend the nation from attack without obtaining prior congressional approval. Judge Silberman's suggestion notwithstanding, see supra at 27–28 (Silberman, J., concurring), President Clinton does not claim that the air campaign was necessary to protect the nation from imminent attack. In his report to Congress, the President explained that the military action was "in response to the FRY government's continued campaign of violence and repression against the ethnic Albanian population in Kosovo." 35 Weekly Comp. Pres. Doc. 527 (Mar. 26, 1999), available at 1999 WL 12654381. Although the President also said that military action would prevent an expanded war in Europe, see Radio Address of the President to the Nation, March 27, 1999, available at 1999 WL 170552, he never claimed that an emergency required him to act without congressional authorization; in fact, the Kosovo issue had been festering for years. See Declaration of Thomas Pickering, Undersecretary of State for Political Affairs, JA at 21.

The government also claims that this case is nonjusticiable because it "requires a political, not a judicial, judgment." The government has it backwards. Resolving the issue in this case would require us to decide not whether the air campaign was wise—a "policy choice[ ] and value determination[ ] constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)—but whether the President possessed legal authority to conduct the military operation. Did the President exceed his constitutional authority as Commander in Chief? Did he intrude on Congress's power to declare war? Did he violate the War Powers Resolution? Presenting purely legal issues, these questions call on us to perform one of the most important functions of Article III courts: determining the proper constitutional allo-

cation of power among the branches of government. Although our answer could well have political implications, "the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications...." *INS v. Chadha,* 462 U.S. 919, 942–43, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). *See also Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("The doctrine ... is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."). This is so even where, as here (and as in the other cases discussed above), the issue relates to foreign policy. *See Baker,* 369 U.S. at 211, 82 S.Ct. 691 ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance"). If "we cannot shirk [our] responsibility" to decide whether an Act of Congress requires the President to impose economic sanctions on a foreign nation for diminishing the effectiveness of an international treaty, a question rife with "political overtones," *Japan Whaling Ass'n,* 478 U.S. at 230, 106 S.Ct. 2860, then surely we cannot shirk our responsibility to decide whether the President exceeded his constitutional or statutory authority by conducting the air campaign in Yugoslavia.

The Government's final argument—that entertaining a war powers challenge risks the government speaking with "multifarious voices" on a delicate issue of foreign policy—fails for similar reasons. Because courts are the final arbiters of the constitutionality of the President's actions, "there is no possibility of 'multifarious pronouncements' on this question." *Chadha,* 462 U.S. at 942, 103 S.Ct. 2764. Any short-term confusion that judicial action might instill in the mind of an authoritarian enemy, or even an ally, is but a small price to pay for preserving the constitutional separation of powers and protecting the bedrock constitutional principle that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch), 137, 177, 2 L.Ed. 60 (1803).