# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 1, 2018          Decided January 15, 2019

No. 17-5082

ESTATE OF EARNEST LEE BOYLAND, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01112)

*Robert E. Hauberg Jr.* argued the cause and filed the briefs for appellants. *Paul A. Robinson Jr.* entered an appearance.

*Jennifer L. Utrecht*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Charles W. Scarborough*, Attorney.

*Stephen P. Murphy* was on the brief for appellee EPIQ Class Action & Claims Solutions, Inc.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Plaintiffs, representing the estates of black male farmers, seek to submit claims of past discrimination in agricultural credit programs to a claims-processing framework set up to resolve Hispanic and female farmers' credit discrimination claims. In this lawsuit, they assert that the claims-processing framework itself discriminatorily excluded them. In short, they raise a discrimination claim about the handling of discrimination claims. They therefore identify two distinct discrimination claims, one nested within the other: the underlying credit discrimination claims, and the current challenge to the framework. Plaintiffs argue that the district court failed to assume the merits of their claim when it held they lacked standing to bring the current challenge. That is incorrect. Plaintiffs lack standing to challenge the framework because they have no live underlying credit discrimination claims to present there.

Plaintiffs sued the United States Department of Agriculture ("USDA" or "the Department") and Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the firm USDA hired to administer the framework, contending they unlawfully discriminated by affording women and Hispanic claimants exclusive access to a remedial claims framework, the very raison d'être of which was to redress USDA's sex and ethnicity discrimination against female and Hispanic farmers. Plaintiffs allege that the farmers whose estates they represent experienced discrimination in USDA agricultural credit and benefit programs—based not on sex or Hispanic ethnicity, but on their black racial identity. That claim is certainly plausible. It is well established that, during the 1980s and 1990s, USDA engaged in systemic discrimination on multiple grounds against many of the farmers its programs were supposed to serve. In fact, it was a class action lawsuit by black farmers (the "Black Farmers" suit) that first illuminated USDA's

rampant credit discrimination and inspired parallel lawsuits by Native American, female, and Hispanic farmers. And USDA modeled the framework at issue here on the claims-processing system it set up in settlement of the Black Farmers' class action.

Plaintiffs in this case never submitted claims in the Black Farmers remedial process. When they instead sought to present their claims in the parallel framework for claims of discrimination against women and/or Hispanic farmers, the claims processor turned them away. Plaintiffs contend that USDA and Epiq thereby invidiously discriminated against them based on their sex and race. They claim that USDA violated the constitutional equal protection guarantee and that Epiq violated the federal statutory prohibition against discrimination by a program or activity that receives federal financial assistance.

In assessing standing, we assume that plaintiffs could prevail on those claims. Plaintiffs' standing nevertheless fails for want of redressability. The claims-processing framework for women and Hispanic farmers, like the parallel one for black farmers, can only make good on live claims. Thus, even assuming plaintiffs succeeded in invalidating the framework's challenged sex and ethnicity limitations, they could not benefit unless they had unexpired claims of credit discrimination to process there.

Because plaintiffs fail to allege that they have any live claims to process in the framework they challenge, the harm they assert from being excluded is not redressable. Plaintiffs' nested claims target discrimination by USDA during the 1980s in violation of the Equal Credit Opportunity Act (ECOA), which prohibits discrimination in credit transactions. 15 U.S.C. § 1691 *et seq*. ECOA's five-year statute of limitations

has long since run on most claims of that vintage. Congress in 1998 legislated an important but limited exception to ECOA's time bar for farmers who had complained of discrimination to USDA between 1981 and July 1997—a period when, Congress found, the Department's internal system for addressing discrimination claims was dysfunctional. Plaintiffs do not allege they sought to press their claims to USDA before July 1997, so they are ineligible to benefit from Congress's tolling of the limitations period for farmers who did. Their decades-old claims are time barred.

Even if we assumed that plaintiffs in fact took steps before 1997 to preserve their claims and merely neglected to so specify in their complaint, they would still be out of luck. Together with everything else they allege, that would mean—as the district court assumed—that they were members of the plaintiff class in the Black Farmers' lawsuit. Any credit discrimination claim a member of the Black Farmers plaintiff class may have had during the relevant period, whether or not actually pursued in the remedial process established under the Black Farmers' consent decree, is now precluded by that decree, or, for any member who opted out, time barred. Thus, even if the challenged framework were not limited to women and Hispanic farmers, it could do nothing to redress plaintiffs' precluded claims.

## I.

### A.

Over the past two decades, USDA has resolved discrimination lawsuits with several different groups of farmers. These lawsuits primarily challenged discrimination in USDA's lending programs in violation of ECOA. 15 U.S.C. § 1691 *et seq.* Farmers' bottom lines fluctuate with the weather and crop prices, so "many farmers depend heavily on the credit

and benefit programs of the United States Department of Agriculture to take them from one year to the next." *Pigford v. Glickman* (*Pigford I*), 185 F.R.D. 82, 86 (D.D.C. 1999) (footnote omitted).[1] If a farmer's crops fail, "he may not have sufficient resources to buy seeds to plant in the following season"; if he needs a new grain harvester, "he often cannot afford to buy the harvester without an extension of credit." *Id.* "Because of the seasonal nature of farming, it also is of utmost importance that credit and benefit applications be processed quickly or the farmer may lose all or most of his anticipated income for an entire year." *Id.*

Public protest over discrimination in USDA's credit and benefit programs spurred the Department to investigate. That scrutiny uncovered a widespread pattern of discrimination in the Department's agricultural credit and benefit programs. In 1996, then-Secretary of Agriculture Dan Glickman appointed a Civil Rights Action Team to assess the Department's history of racial discrimination and recommend changes. *See id.* at 88. The Action Team documented extensive economic harm to minority farmers from discrimination in USDA programs. *See id.* at 86-88. That discrimination owed partly to USDA's practice of delegating loan application decisions to small, local committees in each county. *Id.* at 86. The county committees were far less diverse than the communities they served. *Id.* at 87. USDA denied or delayed processing loan applications, approved insufficient amounts, discriminatorily denied access to loan servicing options, or imposed restrictive conditions on loans because of the applicants' race, sex, or ethnicity. *See* Fourth Am. Compl. 3, *Love v. Veneman*, No. 1:00-cv-02502 (D.D.C. July 13, 2012), ECF No. 160 (female farmers); Eighth

---

[1] Subsequent litigation in the case, not relevant here, became known as *Pigford II*. We refer to *Pigford I* for clarity and consistency with other opinions.

Am. Compl. 2, *Keepseagle v. Veneman*, No. 1:99-cv-03119 (D.D.C. Feb. 11, 2008), ECF No. 460 (Native American farmers); Third Am. Compl. 13, *Garcia v. Veneman*, No. 1:00-cv-02445 (D.D.C. June 30, 2006), ECF No. 144 (Hispanic farmers); *Pigford I*, 185 F.R.D. at 87 (black farmers).

ECOA claims formed the core of the four lawsuits filed against USDA on behalf of black, Native American, women, and Hispanic farmers. ECOA creates a private right of action against a creditor, including the United States, who "discriminate[s] against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, national origin, [or] sex," among other characteristics. *Id.* §§ 1691(a), 1691e(a).

The evidence developed in the *Pigford I* Black Farmers litigation showed that, on top of discrimination by the committees, by 1983, USDA's Office of Civil Rights Enforcement and Adjudication (OCREA), which was responsible for handling civil rights complaints against the Department, "essentially was dismantled and complaints that were filed were never processed, investigated or forwarded to the appropriate agencies for conciliation," to the point that, "[i]n some cases, OCREA staff simply threw discrimination complaints in the trash without ever responding to or investigating them." *Pigford I*, 185 F.R.D. at 88. The public learned of the dysfunction of OCREA in a 1996 report by the U.S. Commission on Civil Rights; only with the publication of the Civil Rights Action Team report the following year did the government begin to reckon with the scale of the discrimination. *See* USDA Civil Rights Action Team, *Civil Rights at the United States Department of Agriculture* 2 (1997); U.S. Comm'n on Civil Rights, *Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs* 255 (1996). The same month the Action Team released its report,

USDA's Office of the Inspector General issued a report describing USDA's lack of transparency and backlog of unprocessed complaints. *See Pigford I*, 185 F.R.D. at 88. "The acknowledgment by the USDA that the discrimination complaints had never been processed, however, came too late for many African American farmers." *Id.* Farmers' legal recourse was limited by the then-two-year statute of limitations on claims of discrimination in credit transactions under ECOA. 15 U.S.C. § 1691e(f); *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1085(7), 124 Stat. 2085, 2113 (2010) (changing the statute of limitations to five years).

In 1998, Congress responded to the farmers' predicament by lifting the time bar for farmers who had made timely efforts to seek administrative redress for credit discrimination but were stymied by the dysfunction at USDA. *See* 7 U.S.C. § 2279 note (Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681) ("Appropriations Act"). The Appropriations Act tolled the statute of limitations for two years after its passage—from October 1998 to October 2000—for people who (1) alleged non-employment-related discrimination by USDA occurring between January 1, 1981, and December 31, 1996, and (2) had filed a complaint with USDA before July 1, 1997. A farmer who complained to USDA in 1983, when OCREA broke down, could have had valid claims based on discrimination as far back as 1981, which presumably accounts for Congress's choice of that year as the beginning of the statutory date range. By confining the Act's beneficiaries to people who had sought to complain to USDA during a period when the Department systematically failed to process farmers' discrimination claims, Congress limited its legislative fix to claimants blocked by OCREA's dysfunction. It did not more broadly waive the statute of limitations for all

farmers who suffered discrimination in the 1981 to 1996 statutory period.

USDA has resolved the discrimination lawsuits of each of the four groups of farmers. For each group, the only farmers permitted to participate in the claims-resolution processes established in response to these cases were those who had, before the suits were filed, complained in some manner of USDA's discrimination. Framework for Hispanic or Female Farmers' Claims Process ¶¶ VIII.A, VIII.B, VIII.C.1.g, *Love*, No. 1:00-cv-02502 (D.D.C. Jan. 20, 2012), ECF No. 155-1 ("*Garcia*/*Love* Framework"); *Keepseagle*, No. 1:99-cv-03119, 2001 WL 34676944, at *6 (D.D.C. Dec. 12, 2001); *Pigford I*, 185 F.R.D. at 92.

USDA settled with the class of Black Farmers first, in 1999, in *Pigford I*. 185 F.R.D. 82. The court approved the creation of a two-track dispute resolution mechanism for distributing proceeds to claimants. Under that process, claimants with less documentary evidence of discrimination received capped payments, while claimants with more documentary evidence could seek to prove and recover actual damages. *Pigford I*, 185 F.R.D. at 95-97.

The process established in *Pigford I* became a template for the other cases. Next, USDA settled a class action suit with Native American farmers. *See Keepseagle*, No. 1:99-cv-03119, 2012 WL 13098692, at *1 (D.D.C. Dec. 28, 2012). Similar lawsuits by Hispanic and female farmers followed, but did not result in class-wide settlements because neither case was certified as a class action. *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) (Hispanic farmers); *Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006) (female farmers). Instead, USDA voluntarily created a joint claims process for both Hispanic and female farmers. *See Garcia*/*Love* Framework. Claimants who

wished to recover under the *Garcia*/*Love* Framework agreed, in the claim packets they submitted, to release their individual claims against USDA. *See id.* ¶ 5; Settlement Agreement, *Love*, No. 1:00-cv-02502 (D.D.C. Feb. 3, 2017), ECF No. 275-1.

As described above, Congress did not toll all claims of discrimination arising between 1981 and 1996—only those of farmers who also brought a complaint of discrimination by July 1, 1997. *See Pigford I*, 185 F.R.D. at 92-93, 100. The plaintiffs here have neither shown nor alleged that they made a credit discrimination complaint to the government at any time, much less by the deadline, as they would have had to do to qualify as *Pigford I* class members.

**B.**

This case addresses whether the plaintiff black farmers who, again, did not file claims in *Pigford I*, may now participate in the *Garcia*/*Love* Framework established to compensate farmers discriminated against because of their sex or Hispanic ethnicity. The plaintiffs are the Black Farmers and Agriculturalists Association, Inc. (BFAA), which describes itself as "a not[-]for-profit organization created for the specific purpose of responding to the issues and concerns of black farmers in the United States and abroad," Appellants' Br. 4, and the estates of three now-deceased black male farmers (the individual plaintiffs), which allege that USDA discriminated against the farmers in lending programs during the 1980s. The individual plaintiffs' current challenge to their exclusion from the *Garcia*/*Love* Framework is pressed by the farmers' children and grandchildren, who are also members of plaintiff BFAA.

In 2013, after the *Pigford* process had closed, plaintiff BFAA unsuccessfully sought to intervene in *Garcia* and *Love* to assert, among other claims, that its members were entitled

under the Equal Protection and Due Process Clauses to participate in the *Garcia*/*Love* Framework. *Garcia*, 304 F.R.D. 77, 81 (D.D.C. 2014), *aff'd*, No. 14-5175, 2014 WL 6725751 (D.C. Cir. Nov. 18, 2014); *Love*, 304 F.R.D. 85, 88 (D.D.C. 2014), *aff'd*, No. 14-5185, 2014 WL 6725758 (D.C. Cir. Nov. 18, 2014). The court denied intervention because, as relevant here, BFAA lacked standing to press its constitutional challenges. *Garcia*, 304 F.R.D. at 82. In the meantime, the three individual plaintiffs submitted claims to the *Garcia*/*Love* Framework. They received denials explaining: "To participate in this Process, you must be either Hispanic/Latino or female. . . . [Y]ou indicated that you are an African American male." J.A. 57, 64, 72.

BFAA and the individual plaintiffs then brought this putative class action against USDA and Epiq. They alleged that USDA and Epiq violated their Fifth Amendment due process and equal protection rights, as well as Title VI of the Civil Rights Act of 1964, by excluding them from the *Garcia*/*Love* Framework because of their race and sex.

The district court granted USDA's motion to dismiss the constitutional claims. It held that issue preclusion barred BFAA from relitigating its standing, because the *Garcia*/*Love* court had already decided the question. *Estate of Boyland v. Young*, 242 F. Supp. 3d 24, at 30 (D.D.C. 2017); *see also Garcia*, 304 F.R.D. at 82; *Love*, 304 F.R.D. at 90. The individual plaintiffs also lacked standing for much the same reason the *Garcia*/*Love* court had given for denying BFAA's standing: their lack of opportunity to present their discrimination claims was not fairly traceable to the *Garcia*/*Love* Framework, but to their own failure to file timely claims for compensation under the *Pigford* settlement. The court dismissed the Title VI claim against Epiq on the ground that the *Garcia*/*Love* Framework was not a "program or

activity" within the meaning of Title VI, and that Epiq had not received "federal financial assistance," a prerequisite to the statute's applicability.

**II.**

We review *de novo* the district court's dismissal for lack of standing, *Young Am.'s Found. v. Gates*, 573 F.3d 797, 799 (D.C. Cir. 2009), and for failure to state a claim on the merits, *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 385 (D.C. Cir. 2018). The plaintiffs bear the burden of establishing our jurisdiction, including the elements of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The requirements of Article III standing are injury in fact, causation, and redressability. *Id.* at 560-61. Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks and citations omitted). The injury must also be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotation marks and alterations omitted). Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted).

Plaintiffs lack standing to sue USDA and Epiq for excluding them from the *Garcia*/*Love* Framework, because they have failed to show that the court could redress any injury they claim from that exclusion.

For purposes of analyzing plaintiffs' standing, we make the requisite assumption that they would prevail on the merits of their claim that, in excluding them from the *Garcia/Love* Framework, USDA and Epiq impermissibly discriminated against them because of their race and sex. Whether a plaintiff

has a legally protected interest that supports standing does not require that he show he will succeed on the merits; if it did, every merits loss would amount to a lack of standing. Instead, "when considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) (citing *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975)); *see also Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (warning against "conflat[ing] standing with the merits").

Even assuming plaintiffs here would prevail on their challenge to their exclusion from the Framework, their injury is not redressable because they lack live credit discrimination claims to present there. The district court accepted the plaintiffs' description of their injury as "the loss of the 'opportunity . . . to present a meritorious claim for discrimination against'" USDA challenging past credit discrimination, as do we. *Estate of Boyland*, 242 F. Supp. 3d at 31 (quoting Compl. ¶¶ 74, 83, 90). That loss of opportunity cannot be redressed by opening the Framework to plaintiffs, because any credit discrimination claims they once had under ECOA have been extinguished, as explained below.

Plaintiffs argue that accounting for this fact in our standing analysis impermissibly folds the merits of their case into standing, but that is not so. Plaintiffs see error only by mistaking what it means to assume, in analyzing standing, that they will prevail on the merits. We must provisionally treat the conduct plaintiffs challenge as in fact unlawful, but we do not assume away other, unchallenged constraints—whether of fact or law. Here, plaintiffs take aim at the limitation of the *Garcia/Love* Framework to victims of discrimination based on sex or Hispanic ethnicity. But they raise no claim against the Framework's limitation to farmers who unsuccessfully sought

redress of credit discrimination from USDA before 1997.[2] That criterion, wholly apart from the Framework's challenged sex- or ethnicity-based limitation, is, whether by operation of preclusion or the statute of limitations, fatal to their current claim.

Plaintiffs read our decisions in *Campbell* and *Animal Legal Defense Fund, Inc. v. Glickman* (*ALDF*), 154 F.3d 426 (D.C. Cir. 1998), as requiring us to accept their "legal theory" when we evaluate their standing. Appellants' Br. 22. But those cases stand for the narrower proposition that a "party need not *prove* that the . . . action it attacks is unlawful . . . in order to have standing to level that attack." *ALDF*, 154 F.3d at 441 (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 368 (D.C. Cir. 1998)). Thus, in *Campbell* we held that plaintiff members of Congress had not suffered the requisite individualized injury to support their legislative standing to seek a declaration that President Clinton violated the Constitution's War Powers Clause, even if he did in fact violate the Clause. 203 F.3d at 23-24. We did not rest on the legal

---

[2] Their only hint in that direction falls wide of the mark. They allege that "any socially disadvantaged farmer or rancher who had not filed a meritorious claim for relief against USDA" is still entitled to do so "under § 14011" of the Food, Conservation, and Energy Act of 2008. J.A. 19. But section 14011 by its terms establishes no such right. That provision says that "[i]t is the sense of Congress that all pending claims and class actions brought against the Department of Agriculture by socially disadvantaged farmers or ranchers . . . including Native American, Hispanic, and female farmers or ranchers, based on racial, ethnic, or gender discrimination in farm program participation should be resolved in an expeditious and just manner." Pub. L. 110-234, § 14011, 122 Stat. 923, 1448 (2008) (codified at 7 U.S.C. § 2279-2 note). It did not thereby revive untimely claims, but only referred to "*pending* claims and class actions," several of which had been filed but not yet settled when the bill was passed. *Id.* (emphasis added).

conclusion that the President "did not take any actions that constitute 'war' in the constitutional sense," as "[t]hat analysis . . . conflate[d] standing with the merits." *Id.* at 23 (disavowing concurrence's reasoning to that effect). In analyzing standing, we had to assume that the President *had* violated the Constitution.

Even assuming the *Garcia*/*Love* Framework unlawfully discriminates, as the current complaint alleges, plaintiffs' injuries are not redressable. That holding is wholly consistent with *Campbell* and *ALDF*. The bar plaintiffs face is no knock against their equal protection and Title VI claims against USDA and Epiq. The problem, rather, is that plaintiffs have not alleged that they have any live credit discrimination claims to press in the Framework. Plaintiffs did not make a discrimination complaint before July 1997, and are thus barred by ECOA's statute of limitations. The district courts here and in *Garcia*/*Love* nevertheless treated the plaintiffs as *Pigford I* class members, who by definition did make a discrimination complaint by that deadline. *See Estate of Boyland*, 242 F. Supp. 3d at 31; *Garcia*, 304 F.R.D. at 81; *Love*, 304 F.R.D. at 88. Even if plaintiffs did make such a complaint, however, they are barred by the *Pigford I* consent decree. Plaintiffs have articulated a theory for opening the Framework, but they have no theory for resurrecting the underlying claims they wish to process there. What follows is a detailed explanation of why that is so.

Plaintiffs do not allege that they complained to USDA before July 1997, and, accepting that they did not do so, two obstacles prevent them from participating in the *Garcia*/*Love* Framework, over and above USDA and Epiq's alleged discrimination. One is statutory: Congress only revived ECOA claims for those farmers who made a prior discrimination complaint by July 1, 1997. Because the plaintiffs' claims were

never revived, they are subject to ECOA's ordinary statute of limitations (which is now five years). That means that their credit discrimination claims, which allege discrimination in the 1980s, are time barred. The second obstacle is that the plaintiffs fail to meet the basic criteria for participation in the *Garcia*/*Love* Framework, race and sex aside, because the Framework requires claimants to have complained of discrimination by July 1997. *See* Status Report Ex. 20-21, *Love*, No. 1:00-cv-02502 (D.D.C. July 18, 2012), ECF No. 162-1; *Garcia*/*Love* Framework ¶¶ VIII.A, VIII.B, VIII.C.1.g. Indeed, the *Garcia*/*Love* Framework includes this requirement because it was a key parameter in Congress's resurrection of ECOA claims. Whatever form the obstacle takes, it prevents the plaintiffs from processing their claims through the Framework.

If plaintiffs did complain of discrimination by July 1997, claim preclusion or the statute of limitations would bar their claims now. As for preclusion, if plaintiffs had made a pre-July 1997 race-based ECOA claim to USDA, they would have qualified as *Pigford I* class members; the *Pigford I* complaint alleged precisely the same kind of racial discrimination as these plaintiffs' nested claims. *See* Seventh Am. Class Action Compl. 4-5, *Pigford v. Veneman*, No. 1:97-cv-1978 (D.D.C. Oct. 26, 1998), ECF No. 92. Plaintiffs do not allege that they opted out of *Pigford I*. If they did not, their claims are barred by the preclusive effects of the *Pigford I* consent decree, which included the following release:

> As provided by the ordinary standards governing the preclusive effects of consent decrees entered in class actions, all members of the class who do not opt out of this Consent Decree . . . and their heirs, administrators, successors, or assigns . . . hereby release and forever discharge the defendant and his administrators or

successors, and any department, agency, or establishment of the defendant, and any officers, employees, agents, or successors of any such department, agency, or establishment . . . from—and are hereby themselves forever barred and precluded from prosecuting—any and all claims and/or causes of action which have been asserted in the Seventh Amended Complaint, or could have been asserted in that complaint at the time it was filed, on behalf of this class.

Consent Decree ¶ 18, *Pigford*, No. 1:97-cv-1978 (D.D.C. Apr. 14, 1999), ECF No. 167 ("Consent Decree"). The court approved the decree, and it binds the class. *See Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1141 (9th Cir. 2013) ("Court-approved settlement agreements . . . have res judicata effect."); 21A Federal Procedure, Lawyers' Edition § 51:258 ("[A] consent judgment entered pursuant to a settlement agreement constitutes a final judgment on the merits in a res judicata analysis."); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4443 (2d ed. 2002) (explaining that "settlement agreements and consent judgments ordinarily support claim preclusion").

The plaintiffs hypothesize that an African American female *Pigford I* class member who failed to present her credit discrimination claims in the *Pigford* process might nonetheless participate in the *Garcia*/*Love* Framework. They contend that must mean that *Pigford I* also lacks preclusive effect on the credit discrimination claims the individual plaintiffs seek to process as estates of African American male farmers. It does not. The *Garcia*/*Love* Framework only processes claims that USDA discriminated against claimants "due to their being Hispanic or female." *Garcia*/*Love* Framework ¶ I. An African American female farmer who failed to file a *Pigford* claim

would have lost her opportunity to submit her race discrimination claims just as the plaintiffs here have. The *Garcia*/*Love* Framework would allow her recovery only for losses caused by sex discrimination, a type of discrimination not at issue in *Pigford* nor in any credit discrimination claims these plaintiffs may have had against USDA. Claim preclusion does not prevent a plaintiff from asserting a ground of recovery that she could not have asserted in the earlier action. *See Littlejohn v. United States*, 321 F.3d 915, 920 (9th Cir. 2003). In *Stewart v. Rubin*, for example, the district court explained that a black female class member in a class action challenging racial discrimination "certainly would not be precluded by the Settlement Agreement" from separately litigating sex discrimination claims. 948 F. Supp. 1077, 1089 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997).

Further, the *Pigford I* consent decree's release only precluded class members from litigating claims that were or could have been asserted in the operative complaint. Consent Decree ¶ 18. It is because *Pigford I* alleged race discrimination, not sex discrimination, that the black male plaintiffs are precluded even while a sex discrimination claim by the black female farmer in plaintiffs' example would not be. *See* 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4443 (2d ed. 2002) ("The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties.").

Plaintiffs do not allege that they opted out of *Pigford* and timely filed their own suit, thereby avoiding *Pigford*'s preclusive effect, but if they in fact did, they still fail because they map no route past ECOA's time bar. Even claims that were revived by Congress's tolling are by now time barred by the revived claims' statute of limitations (which expired on

October 21, 2000). Appropriations Act, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (codified at 7 U.S.C. § 2279 notes).

In any of the scenarios in which the plaintiffs initially sought to complain to USDA of discrimination by July 1997, their claims have been extinguished.

To be clear, only the claims plaintiffs wish to present in the *Garcia*/*Love* Framework (the underlying claims of credit discrimination by USDA in the 1980s) are precluded or time barred. The claims they bring today under the Fifth Amendment and Title VI do not suffer those procedural defects. But the plaintiffs cannot end-run the procedural bars on their underlying credit discrimination claims by nesting them in new framework-discrimination claims not subject to those bars. Those bars operate independently from any potential discrimination by USDA and Epiq, and prevent us from redressing the plaintiffs' injury by offering them an "opportunity . . . to present a meritorious claim for discrimination against" USDA. Compl. ¶¶ 74, 83, 90.

Recognizing those barriers as a standing defect does not collapse all procedural bars into standing issues. If the plaintiffs here sidestepped all the frameworks and sued USDA directly for violating ECOA in the 1980s, the court would dismiss the case on grounds of claim preclusion or untimeliness, rather than standing. The plaintiffs have avoided that fate by nesting procedurally barred claims in non-procedurally barred claims, such that the claims they bring today cannot be dismissed for those reasons. Yet, because their underlying ECOA claims are procedurally barred, we cannot avoid the reality that, even if plaintiffs won an opportunity to present those claims in the Framework, they would be ineligible for redress and thereby lack standing to sue.

Plaintiffs never explained why the consent decree or statute of limitations would not bar their claims. They simply describe the "legal theory of their case" as being "that the USDA's administrative claims process whereby Epiq, at the direction of and on behalf of the USDA, expressly excludes African-American males from participating based solely on their race and gender violates the Fifth Amendment, notwithstanding the *Pigford* consent decrees." Appellants' Br. 23. Even accepting that theory as true does not overcome the independent hurdles of the *Pigford* consent decree and ECOA's statute of limitations. Taking all the complaint's allegations as true, one of those hurdles necessarily blocks the way. The plaintiffs therefore lack standing because their injury is not redressable—even if they satisfy the other prongs of the standing test, and even if they are right on the merits that the *Garcia*/*Love* Framework violates the law.

Because the standing defect is dispositive, we need not consider the district court's holding that issue preclusion prevents BFAA (alone or in addition to the individual plaintiffs) from relitigating its standing. We affirm the district court's decision dismissing the case in its entirety.

*So ordered*.