# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 16, 2020       Decided March 16, 2021

No. 20-1047

NALINI KAPUR, ET AL.,
APPELLANTS

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

OTA BROADCASTING (SFO), LLC,
INTERVENOR

———

Consolidated with 20-1048

———

On Appeals from Orders of the
Federal Communications Commission

———

*Dennis P. Corbett* argued the cause for appellants. With him on the briefs was *Jessica DeSimone Gyllstrom*.

*Sarah E. Citrin*, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were *Ashley S. Boizelle*, Acting General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K.*

*Welch* and *Scott M. Noveck*, Counsel, entered appearances.

   *Beth S. Brinkmann*, *Mace J. Rosenstein*, *Andrew J. Soukup*, and *Rafael Reyneri* were on the brief for intervenor OTA Broadcasting (SFO), LLC, in support of appellee.

   Before: ROGERS, PILLARD and WALKER, *Circuit Judges*.

   Opinion for the Court filed by *Circuit Judge* WALKER.

   WALKER, *Circuit Judge*: Nalini Kapur, Rishi Kapur, and Ravi Kapur own part of a company that operated a California TV station. Much to the Kapurs' chagrin, the majority owners of that company sold the station and its FCC license in 2013. In 2019, the station changed hands again.

   The Kapurs have spent more than eight years trying to roll back those sales. But they haven't shown that what they ask us to do — remand to the FCC to hold a hearing on the first buyer's character qualifications — will likely result in the return of the station. We therefore dismiss their appeals challenging the FCC's orders for lack of standing.

I.

A.

   KAXT-CD is a Bay Area TV station. In 2008, it was struggling. Its owners, Linda and Warren Trumbly, went looking for investors. They found the Kapurs.

   Ravi Kapur, Nalini Kapur (Ravi's mother), and Rishi Kapur (Ravi's brother) "jumped at the chance . . . to realize their dream of operating a television station in Northern California providing ethnically diverse content." JA 255. Together, the Kapurs invested $300,000 in exchange for 42%

1

ownership in the new company, called KAXT, LLC.[1]  We'll call that company the Seller.

### B.

In October 2012, the Seller's owners met to discuss selling the company's assets.  The Kapurs didn't want to sell.  Ravi liked working at the station, and the Kapurs said the station and its FCC license were worth at least double the $8.25 million that a buyer had offered.

The owners deadlocked with the Kapurs on one side and the Trumblys on the other.  So Warren Trumbly filed for arbitration.  He asked an arbitrator to decide whether he (and the Trumbly-aligned members) had authority to sell the company's assets to OTA Broadcasting (SFO), LLC.  We'll call that company the First Buyer.

### C.

In January 2013, the Seller went ahead with a $10.1 million sale to the First Buyer.  That February, the First Buyer applied for the station's FCC license.

The Kapurs opposed the First Buyer's FCC license assignment application.  They asked the FCC to deny (or hold off acting on) the license application because the arbitration determining if the Trumblys could sell the company's assets was ongoing.

In September 2013, the arbitrator found that the sale did not require unanimity, and that the Trumblys, and the members aligned with them, constituted a majority.  Therefore, the

---

[1] In the arbitration, the Kapurs asserted that they invested $430,000, but the arbitrator found that this "was not proved."  JA 233 n.10.  The arbitrator found the Kapurs did invest $270,225 in cash, which was rounded up to $300,000.  *Id.* at 222, 233 n.10.

2

majority owners could sell the company's assets over the Kapurs' objections. In January 2014, the arbitrator issued a final award to that effect.

## D.

After their arbitration loss, the Kapurs asked a California state court to overturn the arbitrator's decision. When that failed, they appealed. And again, they lost. *Kapur v. Trumbly*, No. C076804, 2015 WL 2329294 (Cal. Ct. App. May 14, 2015).

The Kapurs also pressed on at the FCC. Recall that they had opposed the First Buyer's license assignment application because of the ongoing arbitration to determine if the Trumblys could sell to the First Buyer. But now, rather than attacking the Seller's qualifications to sell the station, they attacked the First Buyer's qualifications to buy the FCC license.

When faced with a petition alleging that the grant of a license application would be prima facie inconsistent with the public interest, the FCC "may grant the license without a hearing, but only if it 'finds … that there are no substantial and material questions of fact and that a grant of the application would be consistent with the public interest.'" *California Public Broadcasting Forum v. FCC*, 752 F.2d 670, 674 (D.C. Cir. 1985) (quoting 47 U.S.C. § 309(d)(2)) (cleaned up). In July 2014, the FCC concluded that the Kapurs' allegations against the First Buyer's qualifications did not warrant a hearing and approved the First Buyer's license assignment application.

## E.

The Kapurs spent the next few years telling the FCC that the First Buyer's bad character disqualified it from holding an FCC license. Meanwhile, in October 2017, the First Buyer

3

sold the station to TV-49, Inc. for $2 million. We'll call TV-49, Inc. the Second Buyer.

The Kapurs opposed the Second Buyer's FCC license assignment application. They said the FCC should reject it because the First Buyer — the seller in that transaction — "lack[ed] the basic qualifications to" buy the "license in the first place," though they did not challenge the Second Buyer's qualifications. JA 1079.

In September 2018, the FCC approved the Second Buyer's license assignment application over the Kapurs' objection.

F.

Over the course of five years, the FCC issued eight memoranda and orders rejecting the Kapurs' arguments.[2] Now, the Kapurs challenge all eight decisions. They ask for remand to the FCC for a hearing on the First Buyer's qualifications to hold an FCC license.

"The Kapurs' ultimate goal" is to reinstate the Seller as the station's license holder. JA 1022; *see also* Appellants' Br. at A-II-7.

Speaking of the Seller, it dissolved as of January 2020, though the Kapurs have sued in California state court to stop that dissolution.

II.

Article III limits our jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. To invoke our jurisdiction, the Kapurs must allege (1) an injury-in-fact, (2)

_____

[2] JA 376-80 (July 2014); JA 589-96 (Mar. 2015); JA 716-23 (Dec. 2015); JA 836-46 (Nov. 2017); JA 932-36 (Sept. 2018); JA 1020-24 (Jan. 2020); JA 1120-23 (Sept. 2018); & JA 1137-42 (Jan. 2020).

4

causation, and (3) redressability for both appeals. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). We also assume, for the sake of this analysis, that they will win on both appeals. *Estate of Boyland v. United States Department of Agriculture*, 913 F.3d 117, 123 (D.C. Cir. 2019).

## A.

We begin with injury and traceability.

In the first appeal (20-1047), the Kapurs challenge the license transfer from the Seller to the First Buyer that the FCC approved in July 2014 and the First Buyer's subsequent license renewal application that the FCC approved in March 2015. They say the FCC's decision to approve the First Buyer's license application injured them because they lost their interest in the station, a "unique asset." Appellants' Br. at A-II-4. They also say they reside in the station's viewing area and that Ravi was a regular viewer who is allegedly now injured as an audience member. *Id.* at A-II-6. According to the Kapurs, the FCC caused these injuries by permitting the station's sale. *Id.* at A-II-7.

Their second appeal (20-1048) challenges the license transfer from the First Buyer to the Second Buyer that the FCC approved in September 2018. They again point to the alleged loss of their "unique" investment in the station and of the station's benefit to them as audience members. *Id.* at A-II-10, 14. Traceability is analogous, too: they say the FCC caused this injury by permitting the station's sale to the Second Buyer. *Id.* at A-II-15.

The Kapurs acknowledge that their standing for the second appeal depends on whether they have standing for the first. *See id.* at A-II-9 ("Appellants' injury in this case is directly tied

5

to the injury they suffered in Case No. 20-1047.").   They also acknowledge that because the Second Buyer now holds the license, "their chances of recovering their investment [are] more remote."   *Id*. at A-II-11.

We note our skepticism in view of the affidavit on which the Kapurs rely for their audience standing theory, which does not appear sufficiently concrete or particularized.   *See, e.g.*, *Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539, 546 (D.C. Cir. 2003).   Nonetheless, we assume, without deciding, that the Kapurs' alleged injuries are cognizable, and that the FCC's orders caused them.   But even with these assumptions, they still don't have standing.

### B.

Next, we address redressability.

The Kapurs must allege "a likelihood that the requested relief will redress the alleged injury."   *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998).   The "psychic satisfaction" of winning doesn't cut it.   *Id*. at 107.   Rather, what plaintiffs ask for must be "likely, as opposed to merely speculative," to right the wrong they have suffered.   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). We also bear in mind "our long-standing principle that 'the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of . . . remedies and sanctions.'"   *AT&T Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (quoting *Niagara Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 159 (D.C. Cir. 1967)).

The Kapurs want us to order the FCC to hold a hearing on their character attacks against the First Buyer.   From there, they want the FCC to unwind the sale of the Second Buyer's

license to the First Buyer. Then, they want the FCC to unwind the sale of the First Buyer's license so that the license goes back to the Seller. They note that both sales were subject to unwind provisions.

The Kapurs also want the California state court to stop the Seller's dissolution. After all that, they will have their "unique investment" in the station back. Appellants' Br. at A-II-7. And those actions, they claim, will restore viewers' access to the "diverse set of multiple channels" offered by the Seller. *See id*. at A-II-6.

To get there, the following must occur:

- The Kapurs prove their bad character allegations against the First Buyer at the character hearing.

- The Kapurs convince the FCC that the First Buyer's character flaws disqualified it from selling the license to the Second Buyer.

- The Kapurs convince the FCC that the First Buyer's character flaws disqualified it from buying the license from the Seller.

- The FCC rolls back the two sales, and the Seller gets the license back.

- The Kapurs successfully stop the Seller from dissolving.

To begin, we doubt the Kapurs have shown they are entitled to a hearing on the First Buyer's character or that they are likely to prevail at the hearing. We also doubt they've shown the FCC is likely to roll back not one, but two license transfers, including one it approved six years ago. Thus, even assuming that the Kapurs prevailed on their legal claim of entitlement to

a character hearing, they have not shown any likelihood that the FCC would find the First Buyer was of bad character or, even if it did, that the Commission would order as a remedy the unwinding of the sales to both the First Buyer and the Second Buyer and return of the station to the Kapurs and Trumblys.

But let's assume the Kapurs succeed at the FCC and convince the California state courts to stop the Seller from dissolving. (Otherwise, the license goes back to a company that doesn't exist.)

Even then, they haven't pointed us to anything that would stop the Seller from turning around and selling the company's assets to someone else. So, even giving the Kapurs the benefit of all these doubts, they still end up in the same place they were in 2013: minority shareholders of a company whose controlling owners (a) want to sell, (b) have the authority to sell, and (c) likely have an interested buyer (the Second Buyer, who currently owns and runs the station and whose character the Kapurs have never questioned).

As the arbitrator ruled eight years ago, and as the California courts confirmed, if the majority decides to sell, the Kapurs can't stop them. No amount of complaining about the First Buyer's character to the FCC will change that.

\*     \*     \*

The Kapurs have not shown it is likely they would get the station back, even if we were to award the relief they ask from us.

We therefore dismiss their appeals for lack of standing.